UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No.  21-cv-870 |
| Plaintiff, | ECF Case |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| JOHN PATRICK GORMAN III, | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.   SUMMARY

1.      On February 3, 2015 (local New York time), John Patrick Gorman III ("Gorman" or "Defendant"), a U.S. dollar swaps trader and managing director of a global investment bank (collectively with its affiliates, the "Bank"), trading from Tokyo, Japan for a U.S. affiliate of the Bank, engaged in a scheme to deceive and to manipulate the price of U.S. dollar interest rate swap spreads published on a screen displaying prices from a swap execution facility broker firm ("SEF Broker Firm") in the United States.  Gorman engaged in this scheme in order to benefit the Bank in a separate interest rate swap transaction with a bond issuer (the "Issuer").

2.      The Issuer entered into the interest rate swap transaction (the "Issuer Swap") with a Japanese affiliate of the Bank in connection with a U.S. dollar-denominated bond issuance with a ten-year maturity (the "Bond Issuance").  Both the Bond Issuance and Issuer Swap were priced on February 3, 2015, using a specific screen which displayed prices from the SEF Broker Firm ("19901"), including prices for U.S. dollar interest rate swap spreads with a ten-year maturity

("Ten-Year Swap Spreads").  Gorman knew that the Issuer Swap would be more profitable to the Bank if lower prices for Ten-Year Swap Spreads were displayed on the 19901 screen during the pricing of the Bond Issuance and Issuer Swap.  Thus, Gorman engaged in a scheme to deceive and to manipulate the price of Ten-Year Swap Spreads on a swap execution facility to maximize the Bank's profit on the Issuer Swap, at the expense of the Issuer.

3.      Under the terms of the Issuer Swap, the Bank, through Gorman, would be "buying" a swap from the Issuer (that is, paying a fixed interest rate to the Issuer) based on terms set during the pricing call.  As a result, Gorman could generate profit for the Bank by "selling" swaps (that is, receiving a fixed interest rate) for more than the price the Bank was "buying" them from the Issuer.  Another way Gorman could increase profits for the Bank on the Issuer Swap was to "buy" the Issuer Swap at a lower price—which the Bank could do if a lower price for Ten-Year Swap Spreads was displayed on the 19901 screen during the pricing.

4.      Although he almost never traded through U.S.-based brokers of the SEF Broker Firm, on February 3, 2015 Gorman arranged to trade through a broker who worked at the SEF Broker Firm's U.S. office (the "Broker").  As he explained to another trader at the Bank in a text message on his personal cell phone, Gorman traded through the Broker because at the time the Issuer Swap was pricing, the prices displayed on the 19901 screen were controlled by the SEF Broker Firm in the United States and Gorman wanted to trade through a broker who could "move the screen the quickest."

5.      Before and during the pricing of the Bond Issuance and Issuer Swap, Gorman knew that there was more buying than selling interest in Ten-Year Swap Spreads and knew that as a result, market prices for Ten-Year Swap Spreads had risen and were positioned to continue to rise.  Because of the rising prices, Gorman's supervisor, the head of the Bank's U.S. dollar

swaps desk (the "Swaps Desk"), advised Gorman to sell fewer Ten-Year Swap Spreads at the time of the pricing, because he thought they could sell more Ten-Year Swap Spreads at increasing profits after the time of pricing.

6.      Instead Gorman timed his trading through the Broker during the pricing to move the price of Ten-Year Swap Spreads down on the 19901 screen, in the opposite direction of where the market was moving.  When Gorman stopped trading to move the price of Ten-Year Swap Spreads down on the 19901 screen, the price on the screen immediately rose and, for over 18 hours, did not return to the level to which Gorman's trading had moved it for the pricing.

7.      Although Gorman spoke to the Issuer during the pricing of the Bond Issuance and Issuer Swap and quoted the price displayed on the Broker Screen, Gorman did not disclose to the Issuer that there were more bidders than sellers at the SEF Broker Firm, that market prices had been rising as a result of the heavy buying interest, or that the only reason a lower price was displayed on 19901 during the pricing call was because Gorman had sold Ten-Year Swap Spreads in order to move the price down.  Gorman also did not disclose to the Issuer that he sold Ten-Year Swap Spreads during the pricing not because he legitimately wanted to sell at that price level at that time, but so the Bank could "buy" the Issuer Swap at a lower price, or that he was trading through the Broker in the United States because the 19901 screen was being controlled in the United States and thus his trading through the Broker would move the screen "the quickest."

8.      As Gorman had intended, his trading had the effect of moving the price of the Ten-Year Swap Spread down on the 19901 screen, and the manipulated price was used to price the Issuer Swap with the Issuer, resulting in a more profitable transaction for the Bank and a less profitable transaction for the Issuer.

9.      Gorman later tried to cover up his misconduct.  During the course of the Commission's investigation of Gorman's manipulative trading, the Commission's Division of Enforcement sent Gorman a preservation request, asking that he preserve certain categories of communications on his personal cell phone.  After receiving the request, Gorman deleted communications that were covered by the request, including communications on the messaging application WhatsApp.

10.     After deleting communications covered by the preservation request, Gorman falsely told the Commission—both via a May 1, 2019 letter from his counsel to the Division of Enforcement and in investigative testimony under oath before the Commission on November 20, 2019—that he had complied with the preservation request.  Gorman also falsely told the Commission in his testimony that he only used WhatsApp to communicate with certain other employees of the Bank about social topics.

11.     Through this conduct and the conduct further described herein, Gorman engaged in acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2018), and Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2020), specifically Sections 6(c)(1), (2), and (3) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1)-(3), 13(a)(2) (2018), and Regulations 180.1 and 180.2, 17 C.F.R. §§ 180.1, 180.2 (2020).

12.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

13.     Unless restrained and enjoined by this Court, Gorman is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     JURISDICTION AND VENUE

14.     **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief and to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

15.     **Venue**.  Venue properly lies with the Court pursuant to 7 U.S.C. § 13a-1(e), because acts and practices in violation of the Act occurred within this District.

## III.     THE PARTIES

16.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission's investigation of Gorman's trading was conducted by staff of the Commissions' Division of Enforcement located in the Eastern Regional Office in New York, New York.

17.     Defendant **John Patrick Gorman III** is a U.S. citizen currently residing in the United Kingdom.  From February 3, 2015 to the present (the "Relevant Period"), Gorman has been employed as a managing director and a U.S. dollar swaps trader on the Swaps Desk in

Japan and the United Kingdom by affiliates of the Bank.  At all times during the Relevant

Period, Gorman has been an Associated Person of the Bank's U.S. affiliate, which is registered

as a swap dealer with the Commission (the "U.S. Swap Dealer").  The U.S. Swap Dealer is

located in New York, New York.  Gorman has never been registered with the CFTC in any

capacity.

## IV.    FACTS

### A. The Manipulative and Deceptive Scheme Related to the Issuer Swap

18.    The Issuer is an Asian public financial institution with a mission that includes

promoting international economic and social development and contributing to the stability of the

global financial system.  The Issuer issues bonds to raise funds for, among other things, lending

and investment programs.

19.    The Bond Issuance which was priced on February 3, 2015, consisted of U.S.

dollar-denominated bonds with a ten-year maturity (the "Bonds") and a notional size of $1

billion.  The Bond Issuance paid a fixed rate to investors (the "Bond Coupon").  The Issuer had

mandated the Bank as a joint lead manager of the Bond Issuance.

20.    The planned Bond Issuance would expose the Issuer to interest rate risk, namely,

that prevailing interest rates would fall over the ten-year life of the Bonds while the Issuer's

obligation to pay investors interest on the Bonds would remain fixed.  The Issuer therefore

sought to manage its interest rate exposure by entering into an interest rate swap with one of the

underwriters of the Bonds.  Under the Issuer Swap the Issuer would receive the Bond Coupon

from its counterparty and would pay the counterparty a floating rate of interest of three-month

U.S. dollar Libor plus an additional amount.  The Issuer selected the Bank's Japanese affiliate to

provide the Issuer Swap.

21.     Pricing the Bond Issuance and Issuer Swap required the use of the prices of other U.S.-dollar denominated financial instruments, including ten-year U.S. Treasury prices and the Ten-Year Swap Spread price.  A Ten-Year Swap Spread is a package transaction consisting of a ten-year U.S. dollar fixed-for-floating interest rate swap and ten-year U.S. treasury securities; the price of the Ten-Year Swap Spread is the difference, or spread, in basis points[1] between the ten-year U.S. Treasury yield and the prevailing market interest rate on ten-year U.S. dollar fixed-for-floating interest rate swaps.

22.     The Bonds that the Issuer planned to issue were to be priced during a conference call in which the Issuer and the underwriters of the Bond would participate (the "Pricing Call"). The Issuer Swap was also going to be priced during the Pricing Call.  The Pricing Call would include a practice pricing, referred to as a "dry run," and then a live pricing.  To price the Bonds and Issuer Swap, the current rates of the relevant financial products would be quoted during the Pricing Call from the 19901 screen.  Because the Bank had been selected to provide the Issuer Swap, Gorman participated in the Pricing Call and provided the quotes for the pricing.

23.     The prices displayed on the 19901 screen reflected trading conducted at the SEF Broker Firm, which was a swap execution facility registered with the Commission.  The SEF Broker Firm had brokers located both in the United Kingdom and in the United States.

24.     The 19901 screen was accessible through a widely-used subscription-based market news service.  Banks and other participants in interest rate markets commonly had access to the 19901 screen, and the prices displayed on the 19901 screen were visible to those in the market who had access to that screen.

---

[1] A basis point is one-one hundredth of one percent; for example, a change in interest rates from 2.25 percent to 2.23 percent is a two basis point change.

25.    However, while the 19901 screen displayed prices for U.S. dollar interest rate products, including Ten-Year Swap Spreads, the 19901 screen did not display information about how much buying or selling interest there was at the SEF Broker Firm for these products.  That information could only be obtained by market participants like the Bank who traded through the SEF Broker Firm, by speaking directly to brokers at the SEF Broker Firm.  Other market participants, like the Issuer, who did not trade through the SEF Broker Firm did not have access to that information.  Thus, for example, Gorman could find out how many buyers and sellers of Ten-Year Swap Spreads there were during the Pricing Call by asking the Broker, but the Issuer could not obtain that information on its own.

26.    The price levels quoted during the Pricing Call had a direct impact on the economics of the Issuer Swap.  For example, the additional amount of interest above the three-month U.S. dollar Libor rate paid by the Issuer to the Bank was to be calculated incorporating the price level for Ten-Year Swap Spreads displayed on the 19901 screen.  Specifically, the lower the Ten-Year Swap Spread price on the 19901 screen was during the Pricing Call, the higher the additional amount of interest the Issuer would have to pay to the Bank under the Issuer Swap.

27.    Thus, under the agreed-upon calculation, changes in the price levels of Ten-Year Swap Spreads on the 19901 screen would make the Issuer Swap more or less profitable for the Bank.  For example, if the price of Ten-Year Swap Spreads moved lower by 0.25 basis points, the Issuer would pay the Bank an interest rate above the three-month U.S. dollar Libor rate that was approximately 0.25 basis points higher.  Thus, the movement of the Ten-Year Swap Spread price down would increase the rate of interest the Issuer had to pay to the Bank under the Issuer Swap and thus tend to increase the profitability of the transaction for the Bank.

28.     The Pricing Call for the Bond Issuance and Issuer Swap began at about 11:15am Eastern Standard Time, or 1:15am Japan Standard Time (JST) on February 4, 2015.[2]  Gorman engaged in his manipulative trading in the middle of the night in Tokyo.

29.     Gorman conducted his manipulative trading through the SEF Broker Firm, whose prices were displayed on the 19901 screen.  Gorman almost never traded through U.S.-based brokers of the SEF Broker Firm, and did not have a telephone line which directly connected him to the SEF Broker Firm's office in the United States, as he did with the brokers he ordinarily traded through.  Nevertheless, in anticipation of the pricing of the Bond Issuance and Issuer Swap, Gorman wanted to trade through the SEF Broker Firm's U.S.-based broker rather than another broker.  Gorman explained to another trader on the Swaps Desk ("Swaps Trader 1") that this was because the SEF Broker Firm in the United States "had the screen" and Gorman "***only care[d] who can move the screen the quickest.***"  In other words, the price for Ten-Year Swap Spreads being displayed on the 19901 screen was controlled by the SEF Broker Firm's U.S. office, so a U.S.-based broker could change the displayed price more quickly than a broker in another location.  Gorman further explained that if the screen had been controlled by brokers in the SEF Broker Firm's U.K. office, he would have traded through a broker in the U.K.  Gorman and Swaps Trader 1 had this discussion via text messages on their personal cell phones.

30.     In order to arrange to trade through the SEF Broker Firm in the United States, Gorman took the unusual step of reaching out to the Broker, which he did approximately three hours before the Pricing Call began.  By chat, Gorman confirmed that the Broker was in the office and then told the Broker "I need to put you on an outside line," meaning a phone line on

---

[2] Because Gorman engaged in his manipulative conduct from Tokyo, all times will be given in JST unless otherwise noted.  The Pricing Call and Gorman's manipulative trading surrounding it took place on February 3, 2015 in Eastern Standard Time.

which Gorman could trade.  The Broker provided a phone number that Gorman could call to trade via the Broker.

31.     About an hour and twenty minutes before the Pricing Call, Gorman began texting with the head of the Bank's Swaps Desk (the "Desk Head"), who was located in New York, about the upcoming Issuer Swap and Gorman's planned trading.  Although both the Desk Head and Gorman were generally at their desks at the Bank leading up to and during the Pricing Call, and therefore could have communicated with each other entirely on the Bank's recorded phone lines, or by emails or chats from their Bank computers, which the Bank would retain, the Desk Head and Gorman chose to conduct many of their communications about the transaction by text messages on their personal cell phones, which the Bank did not record and could not monitor. Gorman and the Desk Head continued to communicate about the Issuer Swap on their personal phones until the Pricing Call concluded.

32.     In the text messages with Gorman before and during the Pricing Call, the Desk Head repeatedly advised Gorman that there was a large amount of buying interest from other market participants in Ten-Year Swap Spreads.  For instance, at 11:53pm JST the Desk Head told Gorman "you will find a lot of support in spreads at these levels."  Similarly, at 12:09am JST on February 4, 2015, the Desk Head told Gorman "all spreads are bid" and "There is a payer in 10s."  At 12:41am JST, the Desk Head texted Gorman "10s are going up."  And at 1:05am JST, approximately ten minutes before the Pricing Call began, the Desk Head told Gorman "there is a solid bid for spreads."  In his responses to the Desk Head, Gorman acknowledged that he also saw that the market was moving up.

33.     In the text messages, Gorman and the Desk Head also discussed how far Gorman could move the 19901 screen down, given that market prices were rising.  At 12:51am JST,

approximately 25 minutes before the Pricing Call began, Gorman told the Desk Head he thought he could move the screen down to 13.25 ("i will get the print at 13.25"), but he wouldn't be able to move the price "through" 13.25 to a lower level.  The Desk Head responded that Gorman was "not gonna get 10s down at 13.25" because there are "too many buyers."  Two minutes later, at 12:53am JST, the Desk Head advised Gorman not to "***waste to[o] many bullets***"—that is, not to sell too much—trying to get the price to 13.25.  And at 1:07am JST, just ten minutes before the Pricing Call, in response to the Desk Head's statement that there was a "solid bid for spreads" Gorman said, referring to the upward movement of the market which was unfavorable to the Bank, "***i hate pricing these when momentum is against us.  Takes all the fun out of it.***"

34.     Because of the upward movement of the market, in his text messages with Gorman, the Desk Head repeatedly told Gorman he should sell fewer Ten-Year Swap Spreads.[3] As the market continued to move upward approaching the Pricing Call, the Desk Head several times told Gorman to further decrease the amount he would sell.  For instance, at 12:09am JST, roughly an hour before the Pricing Call, the Desk Head told Gorman to "leave the book long spreads after pricing" by "200k."[4]  By 12:55am, approximately 20 minutes before the Pricing

---

[3]     Because the Bank, in entering into the Issuer Swap, was buying an interest rate swap with a notional value of $1 billion, the Bank could theoretically sell up to $1 billion worth of Ten-Year Swap Spreads and have those transactions offset, in part, the $1 billion Issuer Swap.

In fact, the Bank was going to enter into certain transactions with purchasers of the Bond Issuance that would automatically offset some of the Issuer Swap.  Gorman estimated, prior to the Pricing Call, that that meant the Bank could theoretically sell $750 million worth of Ten-Year Swap Spreads.

[4]     As described above, when the Bank entered into the Issuer Swap, the Bank would be buying a $1 billion interest rate swap, and therefore would be "long" after pricing by that amount.  As Gorman's sales of Ten-Year Swap Spreads in part offset the Issuer Swap, the Bank would become less "long."  By directing Gorman to "leave the book long spreads," the Desk Head was telling Gorman to sell fewer Ten-Year Swap Spreads, which would offset less of the $1 billion of the Issuer Swap, thereby leaving the book "long."  In the text message, the Desk Head expressed the amount that Gorman should leave the book long as "200k," which refers to the DV01, or dollar value of one basis point, of the Ten-Year Swap Spreads.  Here, "200k" in DV01 of Ten-Year Swap Spreads was roughly the equivalent of $250 million notional.  Thus, the Desk Head was directing Gorman to sell $250 million less of Ten-Year Swap Spreads.

Call began, the Desk Head told Gorman to "keep 300k in spreads."[5]  And at 1:25am and 1:26am JST, during the Pricing Call itself, the Desk Head told Gorman "Don't fight the spreads / The more you keep the better."

35.     Selling fewer Ten-Year Swap Spreads was economically rational in at least three respects.  First, because Gorman and the Desk Head expected prices to rise, they expected they could sell at higher prices by selling later.  Second, if prices continued to rise as Gorman and the Desk Head expected they would, if Gorman sold Ten-Year Swap Spreads before buying the Issuer Swap, Gorman would be selling at lower prices and buying at higher prices, guaranteeing he would lose money on the Ten-Year Swap Spreads.  Finally, because there were many bidders in the market, if Gorman were to try to move the price of Ten-Year Swap Spreads down and hold them down while the Issuer Swap priced, he would have to sell even more Ten-Year Swap Spreads at lower prices (*i.e.*, "waste to[o] many bullets," as the Desk Head warned).

36.     Prior to the Pricing Call, Gorman also spoke to Swaps Trader 1 on a recorded line.  Gorman told Swaps Trader 1 that Ten-Year Swap Spreads were "bid here, so I haven't—I've given [i.e., sold] 50 [million Ten-Year Swap Spreads], just to test the waters early, and they're bid 13.25, so I'm not in any rush."  Gorman then started to say "It's gonna to take--" but cut himself off and told Swaps Trader 1, "I'll call you on your cell."

37.     The upward market movement that Gorman, Swaps Trader 1, and the Desk Head discussed was reflected in the prices for Ten-Year Swap Spreads displayed on the 19901 screen.  In the approximately hour and a half period before the Pricing Call, the 19901 screen moved up

---

[5]      As described above, this amount is expressed in DV01.  Here, "300k" of DV01 was roughly the equivalent of $375 million Ten-Year Swap Spreads.

almost a full basis point, from a low of 13 basis points at 11:48pm JST to 13.75 basis points at approximately 1:13am JST.

38.     Nevertheless, despite the upward movement of the market for Ten-Year Swap Spreads, and notwithstanding the advice from the Desk Head, Gorman traded during the Pricing Call to move the price of Ten-Year Swap Spreads down.  Gorman chose to "sell low" during the Pricing Call because he could make money in another transaction—the Issuer Swap.  Because Gorman saw that market prices were rising, because he traded in spite of the Desk Head's warning not to "fight the spreads," and because he intended to move prices down, against the market, Gorman intended to cause an artificial price for Ten-Year Swap Spreads with his trading.

39.     About 30 minutes before the Pricing Call began, at 12:45am JST, Gorman asked the Broker where prices of Ten-Year Swap Spreads were.  The Broker confirmed the large amount of buying interest, telling Gorman that there had been one seller of Ten-Year Swap Spreads, but they had "four or five bids at 13.25"—in other words, there was more demand from buyers than there was supply from sellers.  Gorman asked the Broker if the SEF Broker Firm had four of five bids "right now," and the Broker confirmed that they did.  This information about the number of bids in the market was not available to the Issuer.

40.     Around 12:59am JST, about 15 minutes before the Pricing Call began, Gorman alerted the Broker that the Pricing Call was approaching and Gorman wanted the Broker to be ready for Gorman to trade.  Gorman said, "don't go anywhere, this is going to happen in the next 15 to 20 minutes, alright?"  The Broker responded, "oh yeah, I'm not going anywhere," and then asked Gorman if it would be "in the next three or four minutes?"  Gorman said it wouldn't be in the next three or four minutes.

41.     Around 1:12am JST, minutes before the Pricing Call started, Gorman again checked in with the Broker about the market for Ten-Year Swap Spreads.  The Broker indicated that the bid was at 13.5 and it was "light on the offer," again indicating to Gorman that there was little supply from sellers.  This information about the selling interest in the market was not available to the Issuer.

42.     At 1:13am JST, as participants were beginning to dial in to the Pricing Call, Gorman told the Broker that he would sell, or hit the bid for, Ten-Year Swap Spreads at a price of 13.5.  Gorman sold $50 million worth of Ten-Year Swap Spreads. Gorman's trade caused the price of Ten-Year Swap Spreads on the 19901 screen to move from 13.75 to 13.5.  After the trade, the Broker told Gorman that there were four bids for Ten-Year Swap Spreads, indicating to Gorman that there was still more buying demand than selling supply in the market.  This information about the number of bids in the market was not available to the Issuer.

43.     Gorman was not trading because he legitimately wanted to sell at that price level at that time, but rather, in his own words, to "get the print." [6]  Gorman's trades to "get the print" sent a false signal to the market concerning the supply of Ten-Year Swap Spreads.

44.     The dry run on the Pricing Call began around 1:16am JST, with Gorman on the line.  During the dry run Gorman sold twice more at the price of 13.5, again sending a false signal to the market about supply.  During the dry run, Gorman asked the Broker how the market for Ten-Year Swap Spreads looked.  The Broker told Gorman the market was bid, once again indicating to Gorman that there was more demand in the market than supply.  Gorman asked if there were "lots" of bidders in the market, and the Broker confirmed that there were.  This

---

[6]     Gorman was aware that bond issuers generally wanted to see very minimal movement in the market around the pricing of bond issuances and issuer swaps and could be unhappy if there was excessive movement in the market.

information about the number of bidders in the market was not available to the Issuer.  As part of

the dry run, Gorman quoted the price of Ten-Year Swap Spreads as 13.5—the level to which his

selling had moved the 19901 screen—but he did not disclose any information about buying or

selling interest in the market.

45.     After quoting the price of Ten-Year Swap Spreads as 13.5 in the dry run, the

Broker told Gorman that a buyer wanted to buy Ten-Year Swap Spreads from Gorman, or lift

Gorman's offer, at a price of 13.75.  Gorman agreed to sell Ten-Year Swap Spreads at 13.75.

The Broker also confirmed that all of Gorman's sales, including the trade at 13.75, were the

same counterparty.  After the trade, Gorman continued to offer to sell Ten-Year Swap Spreads at

13.75.  Gorman's trade at 13.75 caused the price of Ten-Year Swap Spreads on the 19901 screen

to move back up from 13.5 to 13.75 at 1:19am JST.

46.     At 1:24am JST, the live pricing began on the Pricing Call.  Immediately after the

start of the live pricing, Gorman told the Broker that he would again sell Ten-Year Swap Spreads

at 13.5.  Gorman told the Broker he only wanted to sell $50 million worth of Ten-Year Swap

Spreads—the minimum amount he could trade while still being able to change prices on the

19901 screen.  Within seconds, Gorman's sale of Ten-Year Swap Spreads caused the price on

the 19901 screen to move from 13.75 to 13.5. Because Gorman was selling Ten-Year Swap

Spreads not because he legitimately wanted to sell at that price level at that time but to move the

price on the 19901 screen down, Gorman's trading sent a false signal to the market and moved

the price for Ten-Year Swap Spreads down.

47.     Twenty seconds after his sale at 13.5, Gorman quoted the price of Ten-Year Swap

Spreads on the Pricing Call as 13.5, the price to which his trading had moved the 19901 screen.

Gorman did not disclose any information about the buying or selling interest in the market.  The

participants on the Pricing Call, including the Issuer, agreed that that was the price displayed on the 19901 screen, and the price of 13.5 was used to price the Issuer Swap.

48.     About a minute after Gorman quoted the Ten-Year Swap Spread price as 13.5 on the Pricing Call, the Broker told Gorman a buyer wanted to buy Ten-Year Swap Spreads from Gorman at 13.75.  Gorman agreed to sell $50 million at 13.75, and then informed the Broker he wanted to stop selling Ten-Year Swap Spreads entirely.  At this time, there were still at least four bidders for Ten-Year Swap Spreads at the SEF Broker Firm.

49.     Gorman's sale at 13.75 caused the price of Ten-Year Swap Spreads on the 19901 screen to rise to 13.75.  Altogether, Gorman's manipulative trading of Ten-Year Swap Spreads during the live pricing caused the 19901 screen to display a price of 13.5 for less than a minute and a half.  Once Gorman stopped selling for the purpose of moving the price of Ten-Year Swap Spreads on the 19901 screen down to 13.5, the price on the 19901 screen immediately rose and for over 18 hours did not return to the 13.5 level to which Gorman's trading had moved it.

50.     All of Gorman's manipulative sales of Ten-Year Swap Spreads were executed on the SEF Broker Firm, a swap execution facility.  Gorman entered into the trades on behalf of the U.S. Swap Dealer and the trades were booked to the U.S. Swap Dealer in New York, New York.

51.     After the Pricing Call, Gorman spoke to the Desk Head on a recorded line and told the Desk Head that altogether, he had sold $400 million Ten-Year Swap spreads, and the remaining amount of Ten-Year Swap Spreads that they had not sold was $600 million.  The Desk Head told Gorman that the transaction had gone "as good as it gets on the spread" because they could sell the remaining Ten-Year Swap Spreads at "even a better price" than the 13.5 they had quoted to the Issuer.  Gorman explained that he sold about $300 million in Ten-Year Swap Spreads at 13.5 "because [the Broker] said there was a couple guys there, but it just kept being

[the same counterparty] and I was like, forget it."  In other words, Gorman explained to the Desk Head that he had sold that amount of Ten-Year Swap Spreads at the price of 13.5 because he was trying to move the price even lower than 13.5, but he had given up trying to do that when he realized he was trading multiple times with the same counterparty at the price of 13.5.  This effort to move the price below 13.5 was consistent with Gorman's statement in his text messages to the Desk Head before the Pricing Call that he thought he could move the screen down to ("get the print at") 13.25.

52.     The Ten-Year Swap Spreads that Gorman sold at the price of 13.5 lost money for the Bank.  The Bank "bought" the Issuer Swap based on the same price, 13.5, as Gorman had sold the Ten-Year Swap Spreads, but Gorman also had to pay a brokerage fee to the SEF Broker Firm for each of his sales at 13.5.  Because of the brokerage fee, Gorman actually sold the Ten-Year Swap Spreads at a worse price than the Bank bought the Issuer Swap.  Gorman locked in this loss when he made his final manipulative sale to move the 19901 screen down during the live pricing on the Pricing Call.  Further, had Gorman not manipulated the price down on the 19901 screen seconds before his ultimate quote of 13.5 for Ten-Year Swap Spreads during the Pricing Call, the Ten-Year Swap Spreads that he had previously sold at the price of 13.5 would have lost even more money for the Bank, since the Bank would have "bought" the Issuer Swap at the higher price of 13.75.

53.     Although the Bank lost money on the Ten-Year Swap Spreads that Gorman sold at 13.5, Gorman's scheme economically benefitted the Bank on the Issuer Swap.  The price of Ten-Year Swap Spreads displayed on the 19901 screen which was used to price the Issuer Swap during the Pricing Call was lower than it otherwise would have been as a result of Gorman's selling Ten-Year Swap Spreads during the Pricing Call in order to move the 19901 screen down.

This lower price resulted in the Issuer Swap being economically worse for the Issuer than it otherwise would have been had Gorman not engaged in the manipulative scheme.

54.    Gorman's manipulative scheme was deceptive to the Issuer.  Although Gorman quoted the price of 13.5 from the 19901 screen, Gorman did not tell the Issuer about the number of bids at the SEF Broker Firm or that market prices for Ten-Year Swap Spreads had been rising as a result of heavy buying interest and that the only reason the price of 13.5 basis points was displayed on the 19901 screen during the Pricing Call was because Gorman traded to move the price down.  Gorman also did not tell the Issuer that Gorman was selling Ten-Year Swap Spreads to move the prices down on the 19901 screen so the Bank could "buy" the Issuer Swap at a lower price and not because he legitimately wanted to sell at that price level at that time. Nor did Gorman tell the Issuer told that Gorman was deliberately trading through the SEF Broker Firm in the United States because the SEF Broker Firm's U.S. office controlled the movements of the 19901 screen during the Pricing and thus his trading through the Broker would move the screen "the quickest."

55.    The Issuer would have wanted to know that Gorman was trading intentionally to move the 19901 screen to disadvantage the Issuer during the Pricing Call, because if the Issuer had known that information, the Issuer would have considered what steps it could take to prevent the resulting lower prices from being used to price the Issuer Swap.  Because the Issuer was unaware of Gorman's manipulative trading, the Issuer did not have the information necessary to allow it to make an informed decision about whether to proceed with its Bond Issuance and Issuer Swap or whether to take steps to prevent the lower price that resulted from Gorman's trading from being used to price the Issuer Swap.

56.     Gorman's manipulative scheme was also deceptive to other market participants. Other market participants were not aware that the only reason the 19901 screen displayed a price of 13.5 during the Pricing Call was because Gorman traded to move the price down in order to benefit the Bank in the Issuer Swap, nor were other market participants aware that Gorman was selling Ten-Year Swap Spreads to move the prices down on the 19901 screen so the Bank could "buy" the Issuer Swap at a lower price and not because he legitimately wanted to sell at that price level at that time.  Nor were other market participants aware that Gorman—who was trading in the middle of the night in Japan—was deliberately trading through the SEF Broker Firm in the United States because the SEF Broker Firm's U.S. office controlled the movements of the 19901 screen during the Pricing Call and thus Gorman's trading through the Broker would move the screen "the quickest."

**B. Gorman's False Statements to the Commission**

57.     Gorman's communications with the Desk Head and Swaps Trader 1 about the February 3, 2015 Issuer Swap were not the only times Gorman used his personal cell phone to communicate with other employees of the Bank about the Bank's business.  Gorman often engaged in such communications, and he conducted such communications on his personal phone by text message, phone calls, and WhatsApp messages, among other means.  At times, Gorman discussed manipulative trading related to the Bank's transactions, as he had done with the Desk Head and Swaps Trader 1 about the February 3, 2015 Issuer Swap.

58.     At the time of the February 3, 2015 Issuer Swap, Gorman was aware that the Commission could, and did, investigate trading to move the 19901 screen in connection with pricing swap transactions, and that in such an investigation of his trading his communications would be scrutinized.  Prior to the February 3, 2015 Issuer Swap, Gorman's trading had been the

subject of a manipulation investigation by the Commission (the "Previous Investigation").  On September 17, 2013, as part of the Previous Investigation, Gorman provided sworn testimony to the Commission.  In the September 17, 2013 testimony, Gorman had to answer questions about whether he engaged in manipulation and whether he intentionally traded to move the 19901 screen in connection with pricing other swap transactions, including swaps with bond issuers.  Gorman also had to answer questions about his communications, on his work devices, with other swaps traders and brokers about that trading, including his communications with the Desk Head, Swaps Trader 1, and the Broker.

59.     Gorman's testimony in the Previous Investigation also served to deflect attention away from his trading during the pricing of swaps with bond issuers.  During his testimony, Gorman falsely stated that he "[n]ever" traded U.S. dollar swaps near 11am New York time while working at the Bank, and confirmed in his answer to a follow-up question that he had not engaged in such trading "a single time" at the Bank.  Gorman provided this testimony to the Commission on September 17, 2013 despite the fact that on September 5, 2013, twelve days before his testimony, Gorman had traded U.S. dollar swaps through the Broker between approximately 10:15am and 10:58am New York time, in the middle of the night in Tokyo.  As with the February 3, 2015 transaction, Gorman had been trading through the Broker, in the middle of the night in Tokyo, for purposes of pricing a swap transaction with a bond issuer. Gorman's false testimony served to deflect attention away from this transaction.

60.     The Desk Head and Gorman had also had a conversation in which they discussed that Gorman should be careful in his work-related communications about what he said and how he said it.  On information and belief, Gorman used personal devices to communicate about the Bank's business, in part, because he knew his trading and communication about trading could be

the subject of questions in an investigation.  In fact, those topics had been the subject of questions in the Previous Investigation.

61.     Gorman used his personal device to communicate about business not only with other traders on the Swaps Desk, as he did on February 3, 2015, but also with Bank employees who were not on the Swaps Desk.  For example, on May 16 and 17, 2018, Gorman sent and received a series of WhatsApp and text messages with a treasury trader at the Bank (the "Treasury Trader") about an upcoming client transaction.  On May 17, the Treasury Trader texted Gorman "we'll probably see the first piece tomorrow do you think ny should set up 30yr spreads a bit?"; Gorman responded that he was "already on it."  Later on May 17, the Treasury Trader sent Gorman a WhatsApp message about trading tickets related to the transaction.  About 15 minutes after that message, Gorman asked the Treasury Trader to keep discussion of the transaction exclusively on WhatsApp rather than on any other messaging platforms, saying "Keep all this stuff on here. Not the other messaging things."  The Treasury Trader agreed to do so.

62.     Gorman also used his personal phone to communicate about the Commission's investigation.  For instance, on March 5, 2019, Gorman sent and received a series of messages on WhatsApp with the Desk Head in which Gorman and the Desk Head discussed the investigation.  In the messages, Gorman discussed what the Commission was "going after" in the investigation.  Gorman also asked the Desk Head for information about other people's interviews or testimony.  Gorman brought up an article about a trader who had been criminally indicted in an unrelated investigation and who had had his case "throw[n] out," and compared the article to the Commission's investigation, telling the Desk Head that the traders on the Swaps Desk had "nothing like that on chats."

63.    On March 15, 2019, Staff working in the Division of Enforcement's Eastern Regional Office, located in New York, New York, sent Gorman, via his counsel, a preservation request, asking that he preserve, among other things, "All communications with any current or former employee of [the Bank]," "All communications concerning the Commission, bond issuances, swap or treasury trading relating to bond issuances, or any inquiry or investigation concerning bond issuances," and "All communications on any messaging application (such as Facebook, Whatsapp, Telegram, Slack, or Signal), including any backed up versions of such communications, whether backed up in cloud storage or in any other location."  Preservation was requested for the period March 1, 2014 to the present.

64.    Gorman became aware of the preservation request on March 16, 2019, when he received a copy by email.

65.    After he became aware of the preservation request, Gorman deleted messages, including WhatsApp messages, that were covered by the preservation request.

66.    On March 18, 2019, Gorman and the Desk Head spoke via WhatsApp.  Gorman told the Desk Head that he had received the preservation request from the Commission and had deleted his WhatsApp.  Gorman advised the Desk Head to delete the Desk Head's WhatsApp account and suggested that the Desk Head tell other traders on the Swaps Desk in New York to delete their WhatsApp accounts as well.

67.    On March 21, 2019, the Division of Enforcement sent Gorman, via his counsel, a subpoena seeking certain categories of documents, including "All communications from January 1, 2015 to the present, including but not limited to text messages … and communications on messaging applications … concerning: a. The Commission; b. Bond issuances; c. Swap or treasury trading relating to bond issuances; d. Any inquiry or investigation concerning bond

issuances" and "All communications, including but not limited to text messages … and communications on messaging applications … with any current or former employee of [the Bank from] February 2 to February 5, 2015."  The Division of Enforcement sent Gorman, via his counsel, a second subpoena on June 15, 2020, seeking "all communications with any current or former employee of [the Bank] or any current or former employee of any interdealer broker" from March 1, 2019 to April 24, 2019.  The instructions included in both subpoenas stated that Gorman had a duty to supplement his responses to the subpoenas, and noted that the obligations created by the subpoenas were continuing in nature.

68.     On or around April 25, 2019, Gorman spoke again to the Desk Head.  After confirming that the Desk Head was on a mobile device—which were not recorded by the Bank— Gorman raised the topic of the Commission's investigation and asked the Desk Head if the Desk Head remembered what they had discussed in their March 18, 2019 conversation.

69.     Gorman's personal phone was imaged on April 24, 2019, close in time to Gorman's second conversation with the Desk Head.  When Gorman's personal phone was imaged, it contained no WhatsApp messages that were responsive to the Commission's March 21, 2019 or April 24, 2019 subpoenas.  Numerous responsive messages were no longer on his phone by April 24, 2019, including the March 5, 2019 WhatsApp messages with the Desk Head concerning the Commission's investigation, additional text messages with the Desk Head from March 17 and 18, 2019, and WhatsApp messages with the Treasury Trader from March 18, 22, and 23, 2019.

70.     Further, by April 24, 2019, Gorman's phone contained only some of the text messages Gorman exchanged with Swaps Trader 1 and the Desk Head about his manipulative trading on February 3, 2015.  Notably, Gorman's phone contained all his messages with Swaps

Trader 1 about the transaction except one. The one missing message with Swaps Trader 1 was the message in which Gorman admitted that he traded through the Broker during the pricing of the Issuer Swap because the 19901 screen was controlled by the SEF Broker Firm in the United States and Gorman wanted to trade through a broker who could "move the screen the quickest." Gorman's phone also contained none of the messages with the Desk Head in which Gorman and the Desk Head discussed how far Gorman could push the prices for Ten-Year Swap Spreads with his manipulative trading.

71.     On May 1, 2019, in response to a request by the Division of Enforcement that Gorman make a statement about whether or not he had complied with the preservation request, Gorman's counsel sent a letter to the staff of the Division of Enforcement's Eastern Regional Office, located in New York, New York, which stated that "Since learning of the Voluntary Preservation Request on March 16, 2019, Mr. Gorman has not destroyed or altered any documents covered by the Voluntary Preservation Request's terms."

72.     Gorman's counsel acted as Gorman's agent in submitting the May 1, 2019 letter to the Division in response to the Division's request that Gorman make a statement about his compliance with the preservation request. Gorman knew that the Division had asked him to make a statement about his compliance with the request, and Gorman's counsel submitted the letter on Gorman's behalf. On information and belief, Gorman provided his counsel the information in the letter about his compliance with the preservation request.

73.     At some point between March 23, 2019 and July 5, 2019, Gorman, who used WhatsApp to communicate with the Treasury Trader about the Bank's business, told the Treasury Trader to close WhatsApp. The last WhatsApp communications between Gorman and the Treasury Trader were on March 23, 2019.

24

74.     On July 5, 2019, the Treasury Trader texted a second treasury trader at the Bank on his personal phone.  The Treasury Trader told the second trader "gorman said to close whatsup [WhatsApp] between us too / lets use text going forward / not only us. with all other people."

75.     On November 20, 2019, Gorman appeared at the Commission's Eastern Regional Office, in New York, New York, for voluntary testimony under oath.  During this testimony, Gorman testified that he had complied with the preservation request, that he took steps after receiving the preservation request not to delete messages, and that if he had deleted a message after receiving the preservation request it would have been accidental.  Gorman also testified that his WhatsApp communications with employees of the Bank other than traders on the Swaps Desk were "entirely social" and did not have "any relevance" to the Commission's investigation.

76.     Gorman's statement that he had complied with the preservation request in the May 1, 2019 letter and his November 20, 2019 testimony was false and misleading.  Gorman's statements in his testimony that he took steps after receiving the preservation request not to delete messages and if he had deleted a message it would have been accidental were also false and misleading.  In fact, Gorman had not complied with the request, and had deleted messages described in the preservation request, including WhatsApp messages.  Gorman knew or reasonably should have known at the time of his statements that the statements were false or misleading; in his November 20, 2019 testimony Gorman admitted that he thought he would remember if he had deleted a message after receiving the preservation request, and he testified that the only reason he would not remember having done so was if he had deleted a message "by accident or if I wasn't thinking."

77.     Gorman's statements about his compliance with the preservation request in the May 1, 2019 letter and the November 20, 20219 testimony were material to the Commission's investigation, in that they falsely indicated that Gorman had not had any communications relevant to the investigation on his personal phone and had not sought to impede the Commission's investigation by deleting such messages.  Gorman's statements were also capable of distracting the Commission from inquiring further into Gorman's use of his personal phone, the relevant messages that he had sent and received on it, and the steps he took to impede the Commission's investigation.

78.     Gorman's statement that his WhatsApp communications with other employees of the bank besides traders on the Swaps Desk were "entirely social" and not relevant to the investigation was also false and misleading.  In fact, Gorman discussed the Bank's business with non-Swap Desk employees via WhatsApp on many occasions, including, as on May 16 and 17, 2018, about upcoming transactions with clients of the Bank, and had told the Treasury Trader on May 17, 2018, that he wanted to keep the discussion of the upcoming transaction on WhatsApp rather than "the other messaging things."  Gorman knew or reasonably should have known at the time of his testimony that the statement was false and misleading.

79.     Gorman's statement that his messages with non-Swaps Desk employees at the bank were "entirely social" and not relevant to the investigation was material to the Commission's investigation, in that it falsely indicated that Gorman had not had any communications relevant to the investigation on his personal phone.  Gorman's statement was also capable of distracting the Commission from inquiring further into Gorman's use of his personal phone, the relevant messages that he had sent and received on it, and the steps he took to impede the Commission's investigation.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I – Use of Manipulative or Deceptive Device

### Violations of Section 6(c)(1) of the Act,
### 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2020)

80.     The allegations set forth in paragraphs 1 through 79 are re-alleged and incorporated herein by reference.

81.     7 U.S.C. § 9(1) makes it unlawful "for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."

82.     17 C.F.R. § 180.1(a) makes it "unlawful for any person, directly or indirectly, in connection with any swap . . . to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

83.     Both the Issuer Swap with the Issuer and the Ten-Year Swap Spreads traded by Gorman via the SEF Broker Firm are swaps subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

84.     As described above, on February 3, 2015, John Gorman, in connection with the Issuer Swap and Ten-Year Swap Spreads, engaged in a manipulative scheme to push the price of

27

Ten-Year Swap Spreads down on the 19901 screen in order to benefit the Bank on the Issuer Swap to the detriment of the Issuer.

85.     By the foregoing conduct, John Gorman directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or manipulative device, scheme, or artifice to defraud the Issuer and other market participants, and Gorman engaged in such conduct intentionally or recklessly.

86.     By the foregoing conduct, John Gorman, directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or omitted to state material facts necessary in order to make his statements to the Issuer not untrue or misleading, and Gorman engaged in such conduct intentionally or recklessly.

87.     By the foregoing conduct, John Gorman directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or engaged or attempted to engage in an act, practice, or course of business which operated or would operate as a fraud or deceit on the Issuer and other market participants, and Gorman engaged in such conduct intentionally or recklessly.

88.     Each and every overt action in furtherance of the use or attempted use of a manipulative or deceptive device or contrivance is alleged herein as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

### Count II – Attempted Price Manipulation

**Violations of Sections 6(c)(3) and 9(a)(2) of the Act,
7 U.S.C. §§ 9(3), 13(a)(2), and Regulation 180.2, 17 C.F.R. § 180.2 (2020)**

89.     The allegations set forth in paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

90.     7 U.S.C. § 9(3) makes it unlawful "for any person, directly or indirectly, to …

attempt to manipulate the price of any swap."

91.     7 U.S.C. § 13(a)(2) makes it unlawful for "[a]ny person to … attempt to

manipulate the price … of any swap."

92.     17 C.F.R. § 180.2 makes it unlawful "for any person, directly or indirectly, to …

attempt to manipulate the price of any swap."

93.     The Ten-Year Swap Spreads traded by Gorman via the SEF Broker Firm are

swaps subject to the prohibitions of 7 U.S.C. §§ 9(3) and 13(a)(2) and 17 C.F.R. § 180.2.

94.     By the foregoing conduct, John Gorman attempted to manipulate the price of Ten-

Year Swap Spreads on a swap execution facility in order to benefit the Bank on the Issuer Swap

to the detriment of the Issuer in violation of 7 U.S.C. §§ 9(3) and 13(a)(2), and 17 C.F.R. §

180.2.

95.     Each and every overt action in furtherance of the attempted price manipulation is

alleged herein as a separate and distinct violation of 7 U.S.C. §§ 9(3) and 13(a)(2), and 17 C.F.R.

§ 180.2.

## Count III – False Statements to the Commission

### Violations of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2) (2018)

96.     The allegations set forth in paragraphs 1 through 95 are re-alleged and

incorporated herein by reference.

97.     7 U.S.C. § 9(2) makes it unlawful "for any person to make any false or misleading

statement of a material fact to the Commission, … or to omit to state in any such statement any

material fact that is necessary to make any statement of a material fact made not misleading in

any material respect, if the person knew, or reasonably should have known, the statement to be

false or misleading."

98.     On May 1, 2019 in a letter from his counsel to the Commission and on November 20, 2019 during investigative testimony under oath before the Commission, Gorman made false or misleading statements of material fact while he knew the statements he made to be false or misleading.  Specifically, Gorman falsely stated that he had complied with the Division's March 15, 2019 preservation request, that he took steps after receiving the preservation request not to delete messages, and that if he had deleted a message after receiving the preservation request it would have been accidental.

99.     On November 20, 2019 during investigative testimony under oath before the Commission, Gorman made an additional false or misleading statement of material fact while he knew the statement he made to be false or misleading.  Specifically, Gorman falsely stated that his WhatsApp communications with other employees of the Bank besides traders on the Swaps Desk were entirely social and not relevant to the investigation.

100.    Each false and misleading statement of material fact, including but not limited to those specifically alleged herein, is alleged as a separate violation of 7 U.S.C. § 9(2).

## VI.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers, enter:

    A.   An order finding that John Gorman violated Sections 6(c)(1), (2), and (3) and 9(a)(2) of the Act, 7 U.S.C. § 9(1)-(3), 13(a)(2) (2018), and Regulations 180.1 and 180.2, 17 C.F.R. § 180.1, 180.2 (2020).

    B.   An order of permanent injunction enjoining Gorman and any of his officers, agents, servants, employees, assigns, or attorneys, and all persons in active concert or participation with him, who receive actual notice of such order by personal service or otherwise, from:

i.      Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. § 9(1), (2), and (3) and 13(a)(2) and 17 C.F.R. § 180.1(a) and 180.2;

ii.      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

iii.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2020)), for his own personal account or for any account in which Gorman has a direct or indirect interest;

iv.      Having any commodity interests traded on Gorman's behalf;

v.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

vi.      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vii.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2020); and/or

viii.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2020)), agent, or any other officer or employee

of any person (as that term is defined in 7 U.S.C. § 1a(38)),

registered, exempted from registration, or required to be registered

with the Commission, except as provided for in 17 C.F.R.

§ 4.14(a)(9).

C.  An order requiring Gorman to pay civil monetary penalties, plus post-judgment

interest thereon, in an amount not to exceed the penalty prescribed by 7 U.S.C.

§ 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties

Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, tit. VII,

§ 701, 129 Stat. 584, 599, *see* 17 C.F.R. § 143.8 (2020), for each violation of the

Act and Regulations described herein;

D.  An order directing Gorman to disgorge, pursuant to such procedure as the Court

may order, all benefits received including, but not limited to, trading profits,

revenues, salaries, commissions, fees, or loans derived directly or indirectly from

acts or practices which constitute violations of the Act and Regulations, as

described herein, and pre- and post-judgment interest thereon from the date of

such violations;

E.  An order directing Gorman to make full restitution, pursuant to such procedure as

the Court may order, to the Issuer in the amount the Issuer was harmed as a result

of the acts and practices constituting violations of the Act and Regulations, as

described herein, and pre- and post-judgment interest thereon from the date of

such violations;

F.  An order requiring Gorman to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2) (2018); and

G.  An order providing such other and further relief as the Court deems proper.

*        *        *

## VII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.


Dated:  February 1, 2021

**COMMODITY FUTURES TRADING COMMISSION**

Manal M. Sultan
Deputy Director
Commodity Futures Trading Commission
Division of Enforcement

By: /s/ Gabriella Geanuleas
Gabriella Geanuleas
Candice Aloisi
Devin Cain
Stephen Painter (*pro hac vice* admission application to be filed)
James Wheaton

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9887
Fax: (646) 746-9939
ggeanuleas@cftc.gov


ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING COMMISSION