USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/28/2022

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

COMMODITY FUTURES TRADING COMMISSION,

                              Plaintiff,

          - against -

JOHN PATRICK GORMAN III,

                              Defendant.

---

**21 Civ. 870 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Commodity Futures Trading Commission ("CFTC") brings this action asserting violations of the Commodity Exchange Act ("CEA") and the CFTC's regulations promulgated thereunder. (See "Complaint" or "Compl.," Dkt. No. 1.) Currently before the Court is defendant John Patrick Gorman III's ("Gorman") pre-motion letter, dated May 21, 2021, which the Court construes as a motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").[1] (See "Motion" or "Mot." Dkt. No. 14.) On June 3, 2021, the CFTC filed a letter opposing the Motion. (See "Opposition" or "Opp'n," Dkt. No. 16.) For the reasons stated below, the Motion is **DENIED.**

---

[1] See Kapitalforeningen Lægernes Invest v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (Mem.) (affirming the district court's ruling deeming the exchange of letters as the motion itself).

## I.   BACKGROUND

A. <u>FACTS</u>[2]

From February 3, 2015, to present, Gorman worked as a managing director and U.S. dollar swaps trader on the swaps desk for a global investment bank ("Bank").[3] In February 2015, Gorman worked for the Bank in Tokyo, Japan. The CFTC's claims against Gorman stem from an interest rate swap transaction ("Issuer Swap") between the Bank and a bond issuer ("Issuer"). The Issuer is an Asian public financial institution that issues bonds for lending and investment programs.

At its core, the Complaint alleges that Gorman manipulatively traded swaps to financially benefit the Bank in the Issuer Swap. As explained below, Gorman traded swaps that were used to assign a price to the Issuer Swap, and Gorman allegedly planned and timed his trades to push down the price of those swaps. And because the price of the swaps was depressed, Gorman's trades allowed the Bank to purchase the Issuer Swap for a lower price. In sum, the scheme was financially beneficial for the Bank in the Issuer Swap.

---

[2]   Except as otherwise noted, the following background derives from the Complaint. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to the plaintiff, as required under the standard set forth in Rule 12(b)(6) and explained in Section II, *infra*.

[3]   The Complaint uses pseudonyms for various entities and individuals not parties to this case (e.g., Bank, Issuer, Broker, etc.), while Gorman's Motion refers to the Bank as Nomura and the Issuer as JBIC. For consistency, the Court will use the pseudonyms in the Complaint.

The CFTC also alleges that Gorman deleted messages on his personal phone regarding his trading when the CFTC began investigating Gorman's trading. By deleting those messages, Gorman violated the CFTC's subpoenas directing him to preserve information responsive to the subpoenas. Gorman then allegedly lied to the CFTC about deleting those messages in the first place.

### 1. Bond Issuance and Swap Transaction

The Bank and Issuer entered into the Issuer Swap in connection with a bond issuance ("Bond Issuance") by the Issuer. The Bond Issuance consisted of U.S. dollar-denominated bonds with a ten-year maturity and a notional value of $1 billion ("Bonds"). The Bonds paid investors a fixed interest rate ("Bond Coupon"). According to the CFTC, the Bond Issuance exposed the Issuer to interest rate risk because prevailing interest rates would fall over the ten-year life of the Bonds. The Issuer intended for the Issuer Swap to hedge its risk by having the Bank (through Gorman) "buy" a swap from the Issuer to offset the Bond Coupon.

According to the terms of the Issuer Swap, the Bank would pay the Issuer an amount equivalent to the Bond Coupon, which was a fixed interest rate. In exchange, the Issuer would pay the Bank an amount based on a floating (or variable) interest rate. Specifically, the Issuer would pay the Bank a floating

interest rate of three-month U.S. dollar LIBOR[4] plus an additional amount above this LIBOR rate. Since the Bond Issuance had a $1 billion notional value, the Issuer Swap had a commensurate notional value of $1 billion.

2. Pricing the Issuer Swap and Bond Issuance

The prices of the Issuer Swap and the Bond Issuance were derived from the prices of other U.S. dollar-denominated financial instruments. These other instruments included: (a) the price for ten-year U.S. Treasury securities, and (b) the price for U.S. dollar interest rate swap spreads with a ten-year maturity ("Ten-Year Swap Spreads"). A Ten-Year Swap Spread is a package transaction of (i) a ten-year U.S. dollar fixed-for-floating interest rate swap and (ii) ten-year U.S. Treasury securities. The price of a Ten-Year Swap Spread is based on the difference (i.e., the spread) in basis points ("BPS")[5] between the ten-year U.S. Treasury yield and the prevailing interest rate on ten-year U.S. dollar fixed-for-floating interest rate swaps. Prices for the ten-year U.S. Treasury securities and Ten-Year Swap Spreads were displayed on a trading screen ("19901 Screen") operated by a swap execution facility broker firm ("SEF Firm"). The prices

---

[4]   LIBOR stands for London Interbank Offered Rate.

[5]   BPS is a unit of measure for interest rates. One basis point equals one-one hundredth of a percent. For example, an interest rate increase from 1.45% to 1.48% equates to an increase of 3 BPS or 0.03%.

on the 19901 Screen reflected trading conducted at the SEF Firm, which had brokers located in the United Kingdom and the United States.

As addressed below, the CFTC alleges Gorman used information from the 19901 Screen to plan and time his trades of Ten-Year Swap Spreads for the purpose of depressing the price. Since the price of the Issuer Swap was based on Ten-Year Swap Spreads, Gorman's trading to depress the price of Ten-Year Swap Spreads would in turn push down the price of the Issuer Swap. This meant the Bank could pay the Issuer less for the Issuer Swap.

The Issuer Swap and the Bonds were priced during a conference call on February 4, 2015, at 1:15 a.m. Japanese Standard Time ("Pricing Call").[6] The Pricing Call included a dry run during which participants practiced pricing the Issuer Swap and the Bonds before moving to live pricing. During the Pricing Call, the Bonds and the Issuer Swap would be priced using the current prices of ten-year U.S. Treasury securities and Ten-Year Swap Spreads quoted on the 19901 Screen. The Issuer and the Bond underwriters — one of whom

---

[6] The Complaint contains several references to the Pricing Call occurring on February 3, 2015, at 11:15 a.m. Eastern Standard Time, but also states that all relevant times will be identified in Japanese Standard Time because Gorman allegedly engaged in manipulative conduct from Tokyo. For consistency, the Court references all dates and times in Japanese Standard Time.

was the Bank — would participate on the Pricing Call. And since the Bank was selected to provide the Issuer Swap, Gorman also participated by providing price quotes for Ten-Year Swap Spreads.

For the Pricing Call, Gorman arranged to trade through a broker ("Broker") at the SEF Firm's U.S. office. Although the 19901 Screen displayed prices for U.S. dollar interest rate products, the 19901 Screen did not display information about the demand at the SEF Firm for buying and selling these products. Information about the demand for these products could only be obtained by market participants, like the Bank, who traded through the SEF Firm. The CFTC alleges Gorman obtained information about the number of buyers and sellers of Ten-Year Swap Spreads during the Pricing by asking the Broker. The Issuer could not, however, obtain the same information because it did not trade through the SEF Firm.

### 3. Economics of the Issuer Swap

The prices quoted during the Pricing Call directly impacted whether the Issuer Swap was profitable for the Bank. As noted above, according to the Issuer Swap, the Issuer would pay the Bank a floating interest rate of three-month U.S. LIBOR plus an additional amount of interest. The price of this additional amount of interest incorporated the price of Ten-Year Swap Spreads displayed on the 19901 Screen. This

6

meant price fluctuations in Ten-Year Swap Spreads displayed on the 19901 Screen made the Issuer Swap more or less profitable for the Bank. Put simply, the CFTC alleges that if the price of Ten-Year Swap Spreads declined on the 19901 Screen, then the Issuer would pay the Bank a higher interest rate, which makes the Issuer Swap more profitable for the Bank.

Although the Issuer Swap offset the Issuer's interest rate risk, that risk essentially shifted to the Bank when it bought the Issuer Swap. The Bank could, however, hedge its risk by selling up to $1 billion in Ten-Year Swap Spreads. The CFTC alleges the Bank planned on selling some Ten-Year Swap Spreads to purchasers of the Bonds, which would automatically offset a portion of the Issuer Swap. Before the Pricing Call, Gorman estimated the Bank could sell $750 million worth of Ten-Year Swap Spreads, and therefore offset $750 million of the Issuer Swap. Gorman ultimately sold hundreds of millions of dollars' worth of Ten-Year Swap Spreads.

In sum, the CFTC alleges Gorman had two ways to generate profit for the Bank through the Issuer Swap. First, the Bank could buy the Issuer Swap at the lowest possible price. This could happen if a lower price for Ten-Year Swap Spreads was displayed on the 19901 Screen during the Pricing Call. The

CFTC alleges Gorman engaged in a scheme to lower the price of Ten-Year Swap Spreads for this purpose. The second way Gorman could generate profit for the Bank is if counterparties bought Ten-Year Swap Spreads from the Bank for a greater price than the Bank paid for the Issuer Swap. In this second method, selling Ten-Year Swap Spreads at a higher price is profitable because counterparties would be obligated to pay the Bank a fixed interest rate that is higher than the Bond Coupon, which was also a fixed interest rate. In other words, counterparties would owe the Bank more than what it had to pay for the Bond Coupon.

4. The Pricing Call

Turning to the Pricing Call itself, the Complaint begins with Gorman's conduct and statements in the hours preceding the Pricing Call. During that time, Gorman communicated with several individuals to coordinate the pricing of the Issuer Swap and his trades of Ten-Year Swap Spreads.

a. Hours Before the Pricing Call

On February 3, 2015, at roughly 10:15 p.m., Gorman contacted the Broker to coordinate his trading through the SEF Firm's U.S. office. The CFTC alleges that Gorman almost never traded through U.S.-based brokers at the SEF Firm. But Gorman explained to another trader on the Bank's swaps desk ("Swap Trader 1") that Gorman wanted to trade through the SEF

Firm's U.S. office because it "had the screen" and he "only care[d] who can move the screen the quickest." (Compl. ¶ 29 (alteration in original).)[7] According to the CFTC, the price of Ten-Year Swap Spreads on the 19901 Screen was controlled by trading at the SEF Firm's U.S. office, and Gorman traded through the Broker because a U.S.-based broker could change the displayed price faster than a broker elsewhere.

Around 11:55 p.m. on February 3, 2015 — or an hour and twenty minutes before the Pricing Call — Gorman began texting the head of the Bank's swaps desk ("Desk Head") about Gorman's trading plan.[8] In text messages before and during the Pricing Call, the Desk Head repeatedly informed Gorman there was a large amount of buying interest in Ten-Year Swap Spreads and the demand was increasing. For example, at 11:53 p.m., the Desk Head told Gorman, "you will find a lot of support in spreads at these levels." (Id. ¶ 32.) At 12:09 a.m., the Desk Head told Gorman, "all spreads are bid" and "[t]here is a payer in 10s." (Id.) And at 12:41 a.m., the Desk Head said "10s are going up," thus informing Gorman that the market for

---

[7]   Gorman explained he would trade through the SEF Firm's U.K. office instead if that office controlled the 19901 Screen.

[8]   The CFTC alleges that Gorman and the Desk Head could have communicated entirely on the Bank's recorded phone lines, or by emails or chats from the Bank's computer, since both were generally at their desks leading up to and during the Pricing Call. However, many of their communications about the Issuer Swap were by text message on their personal phones, which the Bank did not record or monitor.

Ten-Year Swap Spreads was increasing. (Id.) Gorman responded that he noticed the upward movement.

Gorman and the Desk Head also discussed how far Gorman could decrease the price for Ten-Year Swap Spreads on the 19901 Screen, given the rising market price. At 12:51 a.m., Gorman said he could "get the print at 13.25." (Id. ¶ 33.) This meant, according to the Complaint, Gorman could move the price down to 13.25 BPS on the 19901 Screen. Gorman said he could not, however, move the price "through" 13.25 BPS to a lower level. (Id.) In response, the Desk Head said that Gorman was "not gonna get 10s down at 13.25," since there were "too many buyers." (Id.)

Considering the rising market price, the Desk Head repeatedly advised Gorman to sell fewer Ten-Year Swap Spreads. For instance, at 12:09 a.m., about an hour before the Pricing Call, the Desk Head also told Gorman to "leave the book long spreads after pricing" by "200k."[9] (Id. ¶ 34.) The CFTC alleges the Desk Head's instruction meant Gorman should not sell $250 million in Ten-Year Swap Spreads, therefore only selling $750 million of the $1 billion Gorman

---

[9]   The Complaint alleges the Bank took the "long" position on the Issuer Swap since the Bank was buying the Issuer Swap. (Id. ¶ 34 n.4.) The Desk Head's directive to "leave the book long spreads" therefore meant that Gorman should sell fewer Ten-Year Swap Spreads. (Id. at 11 n.4.) In essence, selling fewer Ten-Year Swap Spreads would offset less of the $1 billion of the Issuer Swap and, as a result, "leave the book long." (Id.)

planned to sell.[10] At 12:53 a.m., the Desk Head warned Gorman
to not "waste to[o] many bullets" – i.e., to not sell too
many Ten-Year Swap Spreads – trying to get the price to 13.25.
(Id. ¶ 33 (alteration in original).) And at 12:55 a.m., the
Desk Head revised his earlier instruction by telling Gorman
to "keep 300k in spreads." (Id. ¶ 34.) Like earlier, this
meant Gorman should not sell approximately $375 million in
Ten-Year Swap Spreads.[11] (Id. ¶ 34 n.5.) And at 1:25 a.m. and
1:26 a.m., during the Pricing Call, the Desk Head said to
Gorman "Don't fight the spreads / The more you keep the
better." (Id. ¶ 34.)

The Complaint alleges three reasons why the Desk Head's
instruction to sell fewer Ten-Year Swap Spreads was
economically rational. First, Gorman and the Desk Head
expected the price for Ten-Year Swap Spreads to increase, and
they could sell more Ten-Year Swap Spreads at higher prices
later on. As noted above, this was one way Gorman could
generate profit for the Bank, because counterparties would
owe the Bank more than what the Bank had to pay for the Bond
Coupon. Second, if the price rose as expected, and Gorman

---

[10]  The directive to leave the book long by "200k" refers to the dollar
     value of one BPS ("DV01") of the Ten-Year Swap Spreads. In this case,
     "200k" in DV01 of Ten-Year Swap Spreads is roughly $250 million. (Id.)

[11]  The Complaint alleges that the DV01 of "300k" is approximately $375
     million. (Id. ¶ 34 n.5.)

sold Ten-Year Swap Spreads before buying the Issuer Swap, then Gorman would be selling the Ten-Year Swap Spreads at a lower price and buying the Issuer Swap at a higher price. That would mean the Bank's obligation for the Bond Coupon would be more than it was owed from other counterparties. In other words, the Bank spent more than it would receive, and would certainly lose money. Third, since there were many bidders in the market for Ten-Year Swap Spread, Gorman would have to sell more Ten-Year Swap Spreads at lower prices to move and hold down the price. In other words, Gorman would "waste to[o] many bullets," as the Desk Head warned. (Id. ¶ 33, 35.) That prospect would risk compounding the Bank's losses.

At 12:45 a.m., as the Pricing Call approached, Gorman asked the Broker for the price of Ten-Year Swap Spreads. The Broker told Gorman there had been one seller of Ten-Year Swap Spreads but there were "four or five bids at 13.25." (Id. ¶ 39.) At Gorman's request, the Broker verified that the SEF Firm had four or five bids "right now." (Id.) According to the Complaint, this meant there was more demand than supply for Ten-Year Swap Spreads, and thus confirmed there was a large amount of buying interest. In a separate conversation with Swap Trader 1 prior to the Pricing Call, Gorman said the Ten-Year Swap Spreads were "bid here, so I haven't — I've

given [i.e., sold] 50 [million Ten-Year Swap Spreads], just to test the waters early, and they're bid 13.25, so I'm not in any rush." (Id. ¶ 36 (alteration in original).) As noted earlier, the CFTC alleges that the Issuer could not obtain information about the number of bids in the market because it did not trade through the SEF Firm. Although Gorman said at 12:45 a.m. that the price was at 13.25 BPS, the price for Ten-Year Swap Spreads rose to 13.75 BPS by about 1:13 a.m. This means that the price increased from 13 BPS at 11:49 p.m. to 13.75 BPS at 1:13 a.m.

Gorman made his first trade when participants began dialing into the Pricing Call at 1:13 a.m., when the price was 13.75 BPS. Gorman told the Broker he would sell $50 million in Ten-Year Swap Spreads at 13.5 BPS. The CFTC alleges this was the minimum amount Gorman could trade while being able to move the price on the 19901 Screen. The CFTC further alleges this trade caused the price of Ten-Year Swap Spreads to move down from 13.75 to 13.5 BPS. After that trade, the Broker informed Gorman there were four bids in the market. In other words, there was still more demand than supply and prices would continue to rise.

b. Pricing Call Begins

The Pricing Call was scheduled to begin at 1:15 a.m. and started with a dry run before proceeding to live pricing.

Gorman was on the line when the dry run began at 1:16 a.m. As the dry run took place, Gorman twice sold Ten-Year Swap Spreads at 13.5 BPS. Those were Gorman's second and third trades. The CFTC alleges that those trades sent another false signal to the market about the supply of Ten-Year Swap Spreads, in turn depressing the price. The Broker again advised Gorman that there was more demand than supply and that there were "lots" of bidders in the market for Ten-Year Swap Spreads.

During the dry run, Gorman quoted Ten-Year Swap Spreads at 13.5 BPS, the price to which his trading allegedly moved the 19901 Screen. Soon after Gorman quoted this price, the Broker told Gorman that a counterparty wanted to buy more Ten-Year Swap Spreads from Gorman at 13.75 BPS — an increase from Gorman's previous three trades at 13.5 BPS. Gorman agreed to sell at 13.75 BPS, but the Broker informed him the four previous sales for Ten-Year Swap Spreads were with the same counterparty. The CFTC alleges this fourth trade at 13.75 BPS caused the price of Ten-Year Swap Spreads to increase from 13.5 to 13.75 BPS on the 19901 Screen at 1:19 a.m.

The live pricing began a few minutes later at 1:24 a.m. Despite his last sale at 13.75 BPS, as soon as the live pricing began, Gorman told the Broker he would sell another $50 million of Ten-Year Swap Spreads at 13.5 BPS. This was

Gorman's fifth trade. Within seconds of this latest trade, the price fell from 13.75 to 13.5 BPS on the 19901 Screen. And twenty seconds after this fifth trade, Gorman quoted Ten-Year Swap Spreads at 13.5 BPS to other participants on the Pricing Call. The participants on the Pricing Call agreed 13.5 BPS was the price displayed on the 19901 Screen and the figure to be used for pricing the Issuer Swap.

But around a minute after Gorman quoted the price at 13.5 BPS during the live pricing, the Broker informed Gorman that a counterparty wanted to buy more Ten-Year Swap Spreads at 13.75 BPS. Gorman then sold another $50 million in Ten-Year Swap Spreads at 13.75 BPS, but he also told the Broker he wanted to stop selling entirely. This was Gorman's sixth and final trade. After this sixth trade, the price on the 19901 Screen rose again to 13.75 BPS.

The CFTC claims Gorman's trading during the live pricing caused the 19901 Screen to display a price of 13.5 BPS for less than a minute and a half. But once Gorman stopped trading to move the price to 13.5 BPS, the price on the 19901 Screen rose for over 18 hours before finally returning to 13.5 BPS.

    c. <u>After the Pricing Call</u>

Gorman spoke with the Desk Head on a recorded line once the Pricing Call ended. Gorman said he sold $400 million worth of Ten-Year Swap Spreads and that $600 million went unsold.

15

The Desk Head responded that the transaction went "as good as it gets on the spread" because they could sell the rest of the Ten-Year Swap Spreads at "even a better price." (Id. ¶ 51.) Gorman further explained that he sold $300 million in Ten-Year Swap Spreads at 13.5 BPS "because [the Broker] said there was a couple guys there, but it just kept being [the same counterparty] and I was like, forget it." (Id. (alteration in original).) The CFTC alleges that Gorman in essence explained that he sold the $300 million of Ten-Year Swap Spreads at 13.5 BPS because he was trying to move the price even lower than 13.5 BPS, but Gorman gave up when he knew the multiple trades at 13.5 BPS were with the same counterparty. The CFTC further alleges that Gorman's efforts to move the price below 13.5 BPS are consistent with Gorman's statement to the Desk Head before the call that Gorman could move the 19901 Screen or "get the print at" 13.25 BPS. (Id. ¶¶ 33, 51.)

The irony of Gorman's endeavor is that the Bank lost money on these transactions. Even though the Bank bought the Issuer Swap at the lower price of 13.5 BPS, Gorman also had to pay a brokerage fee to the SEF Firm for each of his trades at 13.5 BPS. Because of the brokerage fee, Gorman sold the Ten-Year Swap Spreads for less than what the Bank paid for the Issuer Swap. Therefore, the Bank lost money on Gorman's

trades because it spent more on the trades than it earned on the Issuer Swap.

Regardless, the CFTC alleges Gorman's trading benefitted the Bank. If Gorman did not depress the price of Ten-Year Swap Spreads to 13.5 BPS, then the Bank would have bought the Issuer Swap at a higher price (e.g., 13.75 BPS) and lost even more money. While Gorman's trading curbed the Bank's losses, the CFTC alleges the transactions were detrimental to the Issuer since the Bank would have otherwise paid the Issuer a higher price for the Issuer Swap.

Gorman's scheme allegedly deceived the Issuer. The Complaint alleges that when Gorman quoted the price at 13.5 BPS on the Pricing Call, Gorman did not disclose the number of bids at the SEF Firm or that prices for Ten-Year Swap Spreads rose due to heavy buying interest. Importantly, Gorman did not tell the Issuer that he was selling Ten-Year Swap Spreads to depress the price on the 19901 Screen to in turn help the Bank buy the Issuer Swap at a lower price, and not because he legitimately wanted to sell at that time. Gorman also failed to disclose that the only reason the price on the 19901 Screen was 13.5 BPS during the Pricing Call was that he traded to move it down. And Gorman did not tell the Issuer he traded through the SEF Firm's U.S. office because that office could move the 19901 Screen the fastest.

The Complaint alleges the Issuer would have wanted to know this information so it could consider how to prevent the lower prices from being used to price the Issuer Swap. The CFTC claims the Issuer could not, without this information, evaluate whether to proceed with pricing the Bond Issuance and Issuer Swap, or how to prevent the lower price from being used to price the Issuer Swap. The CFTC also alleges this scheme was deceptive to other market participants because they did not know the price of Ten-Year Swap Spreads on the 19901 Screen was being depressed because of Gorman's trading, which was designed to help the Bank buy the Issuer Swap at a lower price.

5. <u>Gorman's Statements to the CFTC</u>[12]

The Complaint alleges Gorman knew, prior to the Pricing Call, that the CFTC investigated trading intended to move the price on the 19901 Screen in connection with pricing swaps, and Gorman was aware that his communications would be inspected. The CFTC alleges, on information and belief, that Gorman used personal devices to discuss the Bank's business because he knew his trading and communications could be scrutinized during an investigation. Gorman used his personal

---

[12] The Court summarizes the allegations regarding Gorman's false statements to the CFTC addressed in Count III, even though, as noted below, Gorman has not moved to dismiss Count III.

devices to communicate with Bank employees who worked on and off the Bank's swaps desk. Aside from discussing the Bank's business, Gorman also used his personal devices to discuss the CFTC's investigation into his trading around the Pricing Call.

On March 15, 2019, the CFTC sent Gorman, through his counsel, a preservation request for information from March 1, 2014, to the present ("March 15 Notice"). The March 15 Notice advised Gorman to preserve the following information: "All communications with any current or former employee of [the Bank]"; "All communications concerning the Commission, bond issuances, swap or treasury trading relating to bond issuances, or any inquiry or investigation concerning bond issuances"; and "All communications on any messaging application (such as Facebook, Whatsapp, Telegram, Slack, or Signal), including any backed up versions of such communications, whether backed up in cloud storage or in any other location." (Id. ¶ 63 (alteration in original).)

Gorman received a copy of the March 15 Notice the next day. The CFTC alleges that after Gorman became aware of the March 15 Notice he deleted messages, including WhatsApp messages, that fell under the March 15 Notice. On March 18, 2019, Gorman told the Desk Head, via WhatsApp, that Gorman received the March 15 Notice. Gorman then encouraged the Desk

19

Head to delete the Desk Head's WhatsApp account and recommended that the Desk Head direct other traders on the swaps desk in New York to do the same. Gorman then deleted his WhatsApp account.

On March 21, 2019, the CFTC sent Gorman, again through his counsel, a subpoena seeking certain documents ("March 21 Subpoena"). The March 21 Subpoena requested the following information: "All communications from January 1, 2015, to present, including but not limited to text messages . . . and communications on messaging applications . . . concerning: a. The Commission; b. Bond issuances; c. Swap or treasury trading relating to bond issuances; d. Any inquiry or investigation concerning bond issuances"; and "All communications, including but not limited to text messages . . . and communications on messaging applications . . . with any current or former employee of [the Bank from] February 2 to February 5, 2015." (Id. ¶ 67 (alterations in original).) The March 21 Subpoena instructed Gorman that he was obligated to supplement his responses and this obligation was ongoing.

On April 24, 2019, the CFTC imaged Gorman's personal cellphone by copying all the data on the phone's storage and memory space. When it was imaged, Gorman's cellphone did not contain any WhatsApp messages responsive to the March 15 Notice or the March 21 Subpoena. On May 1, 2019, Gorman's

counsel sent a letter to the CFTC responding to a request for a statement from Gorman about whether he complied with the preservation request ("May 1 Letter"). Gorman's counsel stated, "Since learning of the Voluntary Preservation Request on March 16, 2019, Mr. Gorman has not destroyed or altered any documents covered by the Voluntary Request's terms." (Id. ¶ 71.) The CFTC alleges that Gorman provided his counsel with the information in this letter and Gorman's counsel submitted this letter on Gorman's behalf.

On November 20, 2019, Gorman appeared at the CFTC's Eastern Regional Office in New York to voluntarily provide testimony under oath ("November 20 Testimony"). Gorman testified that he complied with the preservation requests and took steps after receiving the requests to not delete messages, but if he did delete messages, then it was accidental. Gorman also testified that his WhatsApp messages with other Bank employees, other than traders on the swaps desk, were "entirely social" and did not have "any relevance" to the CFTC's investigation. (Id. ¶ 75.)

The CFTC alleges that Gorman's statements in the May 1 Letter and during the November 20 Testimony were false and misleading because Gorman deleted messages responsive to the March 15 Notice and the March 21 Subpoena. As a result, Gorman allegedly lied to the CFTC about complying with the Notice

21

and Subpoena. Gorman's misstatements in the May 1 Letter and
the November 20 Testimony were allegedly material to the
CFTC's investigation because Gorman falsely indicated there
were no communications relevant to the investigation on his
personal phone and that Gorman did not attempt to impede the
investigation by deleting messages.

B. <u>PROCEDURAL HISTORY</u>

Consistent with the Court's Individual Practices, on May
21, 2021, Gorman wrote to the CFTC regarding an anticipated
motion to dismiss Counts I and II of the Complaint under Rule
12(b)(6). (<u>See</u> Mot.) On June 7, 2021, the CFTC responded by
letter and set forth its Opposition to the Motion. (<u>See</u>
Opp'n.) On June 16, 2021, Gorman advised the Court that the
parties' letter exchange failed to resolve their dispute.
(<u>See</u> Dkt. No. 17.) On June 18, 2021, the CFTC sought
permission to file a response to Gorman's June 16 letter
because Gorman's letter presented arguments not raised in the
parties' earlier exchange. (<u>See</u> Dkt. No. 18.) The Court
advised the parties that it would consider the need for
further briefing or correspondence after reviewing the
parties' pre-motion exchange. (<u>See</u> <u>id.</u>) The Court now
construes Gorman's May 21 letter as a motion to dismiss under
Rule 12(b)(6), and the Court will resolve the Motion on the
basis of the pre-motion letters and material in the record.

See Kapitalforeningen, 779 F. App'x at 70 (affirming the
district court's ruling deeming the exchange of letters as
the motion itself).

## II.   LEGAL STANDARD

To survive a motion to dismiss, pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570
(2007)). A complaint satisfies this standard when it contains
sufficient "factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." Id. A complaint should be dismissed if
the plaintiff has not offered factual allegations sufficient
to render the claims facially plausible. See id. However, if
the factual allegations sufficiently "raise a right to relief
above the speculative level," then a court should not dismiss
a complaint for failure to state a claim. Twombly, 550 U.S.
at 555.

When resolving a motion to dismiss, the Court's task is
to "assess the legal feasibility of the complaint, not . . .
the weight of the evidence which might be offered in support
thereof." In re Columbia Pipeline, Inc., 405 F. Supp. 3d 494,
505 (S.D.N.Y. 2019) (quoting Eternity Glob. Master Fund ltd.

v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 176 (2d Cir. 2004)). At this stage, a court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual . . . allegations." Dane v. UnitedHealthcare Ins., 974 F.3d 183, 188 (2d Cir. 2020).

For claims based on misrepresentations or omissions, a plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). See, e.g., Menora Mivtachim Ins. v. Int'l Flavors & Fragrances Inc., No. 19 Civ. 7536, 2021 WL 1199035, at *8 (S.D.N.Y. Mar. 30, 2021) (noting securities fraud claims based on misrepresentations and omissions must satisfy Rule 9(b)); In re Platinum & Palladium Antitrust Litig., No. 14 Civ. 9391, 2017 WL 1169626, at *30 (S.D.N.Y. Mar. 28, 2017) (finding market manipulation claim under the CEA sounded in fraud because it was based on misrepresentations and omissions). To satisfy Rule 9(b), a misrepresentation or omission claim must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164,

170 (2d Cir. 2004) (quoting <u>Mills v. Polar Molecular Corp.</u>,
12 F.3d 1170, 1175 (2d Cir. 1993)).

The Court follows the majority of courts in this Circuit
that apply a case-by-case approach for determining whether
Rule 9(b) applies to market manipulation claims under the
CEA. <u>See</u> <u>Myun-Uk Choi v. Tower Rsch. Cap. LLC</u>, 165 F. Supp.
3d 42, 47 (S.D.N.Y. 2016). When "the complaint merely alleges
a scheme based on a manipulative trading strategy or abuse of
market power, 'courts have found [Federal Rule of Civil
Procedure] 8(a) is more appropriate.'" <u>Id.</u> (quoting <u>In re</u>
<u>Term Commodities Cotton Futures Litig.</u>, No. 12 Civ. 5126,
2013 WL 9815198, at *10 (S.D.N.Y. Dec. 20, 2013)).

Even when Rule 9(b) applies to a manipulation claim, the
claim "can involve facts solely within the defendant's
knowledge." <u>In re Tether & Bitfinex Crypto Asset Litig.</u>, No.
19 Civ. 9236, 2021 WL 4452181, at *33 (S.D.N.Y. Sept. 28,
2021) (quoting <u>Platinum</u>, 2017 WL 1169626, at *30). As a
result, district courts may apply a relaxed Rule 9(b)
standard, which is satisfied when the complaint "simply
specif[ies] what manipulative acts were performed, which
defendants performed them, when the manipulative acts were
performed, and what effect the scheme had on the market for
the securities at issue." <u>Id.</u> (quoting <u>Platinum</u>, 2017 WL
1169626, at *30).

The CFTC has two theories of how Gorman violated the CEA. First, Gorman's failure to disclose his trading and other market conditions was a material omission. (See Compl. ¶¶ 54-56, 86; Opp'n at 2.) This theory clearly sounds in fraud, because it is based on Gorman's material omissions, and must therefore satisfy Rule 9(b). Second, Gorman's trading constitutes a scheme to manipulate the price of Ten-Year Swap Spreads. (See Compl. ¶¶ 42-49, 85, 87; Opp'n at 1-2.) This second theory is based on Gorman's planning and timing of his trades, and thus the standard pleading requirements of Rule 8(a) should apply. But even if Rule 9(b) applied to the CFTC's manipulation theory, the Complaint satisfies Rule 9(b)'s relaxed pleading standards by alleging the manipulative acts Gorman performed, when Gorman performed those acts, and the effect Gorman's scheme had on the market for Ten-Year Swap Spreads. See Tether, 2021 WL 4452181, at *33.

### III.   DISCUSSION

The CFTC alleges three violations of the CEA. Count I asserts that Gorman used a manipulative or deceptive device in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Rule 180.1(a) promulgated thereunder, 17 C.F.R. § 180.1(a). Count II alleges attempted price manipulation in violation of Sections 6(c)(3) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(3), 13(a)(2), and Rule 180.2, 17 C.F.R. § 180.2. Count

III alleges Gorman made false statements to the CFTC in violation of Section 6(c)(2) of the CEA, 7 U.S.C. § 9(2). Since Gorman has moved to dismiss only Counts I and II, (see Mot. at 1-3), the Court will not address Count III.

A. MANIPULATIVE OR DECEPTIVE DEVICE

Section 6(c)(1) states, in relevant part, it is "unlawful for any person, directly or indirectly, to use or employ . . . in connection with any swap . . . any manipulative or deceptive device or contrivance," in violation of CFTC regulations. 7 U.S.C. § 9(1). Rule 180.1(a) was promulgated thereunder and prohibits intentionally or recklessly committing one of the following acts in connection with any swap:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 180.1(a).

Section 6(c)(1) and Rule 180.1(a) are, respectively, carbon copies of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated by the Securities and Exchange

Commission ("SEC"). Section 6(c)(1)'s text is virtually identical to Section 10(b). Cf. 15 U.S.C. § 78j(b) (making it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," in violation of SEC regulations). Because of this similarity, the CFTC "deem[ed] it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b-5." See Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) (to be codified at 17 C.F.R. pt. 180) [hereinafter CFTC Final Rule].

Although there is a dearth of law analyzing Section 6(c)(1) and Rule 180.1(a), "courts have looked to the securities laws when called upon to interpret similar provisions of the CEA." Loginovskaya v. Batratchenko, 764 F.3d 266, 272 (2d Cir. 2014) (quoting Saxe v. E.F. Hutton & Co., 789 F.2d 105, 109 (2d Cir. 1986)). As a result, the Court will analyze the case law regarding Section 10(b) and Rule 10b-5 to evaluate whether the CFTC has plausibly alleged a Section 6(c)(1) and Rule 180.1 claim against Gorman.

The CFTC has two theories of how Gorman violated Rule 180.1(a). The first theory is that Gorman's trading was a manipulative scheme in violation of Rule 180.1(a)(1) and (3).

(See Compl. ¶¶ 29-47; Opp'n at 1-2.) Rule 180.1(a)(1) and (3) prohibit what courts call "scheme liability" for "those who, with scienter, engage in deceitful conduct." SEC v. Sugarman, No. 19 Civ. 5998, 2020 WL 5819848, at *5 (S.D.N.Y. Sept. 30, 2020) (quoting SEC v. Jean-Pierre, No. 12 Civ. 8886, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)) (analyzing Rule 10b-5(a) and (c)). According to the CFTC's second theory, Gorman violated Rule 180.1(a)(2) by failing to disclose his trades and certain information about market conditions to the Issuer and other market participants. (See Compl. ¶¶ 54-56; Opp'n at 2.) A "scheme liability claim is aimed at 'inherently deceptive conduct' and does not require a misleading statement or omission," whereas a Rule 180.1(a)(2) claim prohibits misrepresentations or omissions. See In re Mindbody, Inc. Sec. Litig., 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020) (quoting In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012)) (analyzing Rule 10b-5(b)). The Court addresses each theory in turn.

    1. Scheme to Manipulate - Rule 180.1(a)(1) and (3)

To plead scheme liability under Rule 180.1(a)(1) and (3), the CFTC must allege that Gorman (i) committed a manipulative or deceptive act, (ii) in furtherance of the alleged scheme, and (iii) with scienter. See SEC v. Sason,

433 F. Supp. 3d 496, 508-09 (S.D.N.Y. 2020) (analyzing scheme liability claim under Rule 10b-5(a) and (c)).

a. <u>Open-Market Manipulation</u>

The CEA does not define manipulation but "a court will find manipulation where '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'" <u>In re Amaranth Nat. Gas Commodities Litig.</u>, 730 F.3d 170, 173 (2d Cir. 2013) (quoting <u>Hershey v. Energy Transfer Partners</u>, 610 F.3d 239, 247 (5th Cir. 2010)). "An artificial price is a price that 'does not reflect basic forces of supply and demand.'" <u>CFTC v. Parnon Energy Inc.</u>, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) (quoting <u>In re Soybean Futures Litig.</u>, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995)). To establish the specific intent element of a manipulation or attempted manipulation claim, the CFTC must adequately allege the defendant "acted (or failed to act) with the purpose or conscious object of causing or [a]ffecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." <u>Parnon</u>, 875 F. Supp. 2d at 249 (quoting <u>In re Energy Transfers Partners Nat. Gas Litig.</u>, No. 07 Civ. 3349, 2009 WL 2633781, at *5 (S.D. Tex. Aug. 26, 2009)).

30

Gorman argues that the CFTC fails to establish either the presence of an artificial price for Ten-Year Swap Spreads or that Gorman intended to manipulate the price. (Mot. at 2.) Gorman contends his trades did not cause an artificial price since the trades were open-market activity with the "legitimate purpose of hedging risk" on the Issuer Swap, and relatedly that he intended to hedge the Bank's risk but not manipulate the price. (See Mot. at 2.)

Unlike patently manipulative practices,[13] open-market activity appears facially legitimate and "is not expressly prohibited." SEC v. Masri, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007). Open-market activity includes practices such as "short sales and large or carefully timed purchases or sales of stock." Id. This leads to a problem of when to "distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers." Id. (quoting GFL Advantage Fund v. Colkitt, 272 F.3d 189, 205 (3d Cir. 2001)).

The Second Circuit's decision in ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007), began

---

[13] Patently manipulative practices include "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977). These practices serve only to send false information to the market and artificially inflate prices.

a line of cases in this Circuit that found open-market activity combined with manipulative intent constitutes manipulation. The <u>ATSI</u> court recognized that "short selling — even in high volumes — is not, by itself, manipulative. . . . To be actionable as a manipulative act, short selling must be willfully combined with *something more* to create a false impression of how market participants value a security." <u>Id.</u> at 101 (emphasis added). The <u>ATSI</u> court reasoned that intent to manipulate was "something more" because "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." <u>Id.</u> at 102.

In <u>Masri</u>, the SEC alleged that a purchase of 200,000 shares in a television network by a securities trader ("Masri") constituted open-market manipulation. 523 F. Supp. 2d at 363–66. The SEC alleged Masri timed and planned the size of his purchase to push the stock price upward so Masri could avoid an obligation, pursuant to a put option, to buy an additional 860,000 shares in the television network. <u>Id.</u> The <u>Masri</u> court found that "if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation." <u>Id.</u> at 372. The court held that the SEC adequately alleged Masri's open-

market trades were manipulative because: (1) the trades were timed within minutes of the close of trading; (2) the trades constituted a large majority of the purchases that day for those shares; (3) the outstanding put options were imminently expiring and Masri did not want to fulfill his obligation pursuant to those put options; and (4) buying the 200,000 shares allowed Masri to avoid his obligation. See id. at 372.

The court in In re Amaranth Natural Gas Litigation, 587 F. Supp. 2d 513 (S.D.N.Y. 2008), aff'd, 730 F.3d 170, extended this line of cases to the CEA. The court applied ATSI to find open-market activity is a basis for liability when there is "'something more,' some additional factor that causes the dissemination of false or misleading information." Id. at 534. The Amaranth court distilled "something more" down to a basic principle: "a legitimate transaction combined with an improper motive is commodities manipulation." Id. The court held that the plaintiffs plausibly alleged "something more" as to two individual defendants, based on (1) the timing of the trades at issue, (2) the defendants' statements and trades, and (3) the size of the swap holdings at issue. Id. at 540-41.

In Sharette v. Credit Suisse International, 127 F. Supp. 3d 60, 82-84 (S.D.N.Y. 2015), this Court applied ATSI to find that private plaintiffs adequately alleged the defendants'

high-volume short selling was manipulative despite being open-market activity. This Court held the plaintiffs adequately pleaded "something more" by alleging "not only high-volume short selling, but also a coordinated scheme engineered by the [defendants] to use short selling to manipulate the price of [the relevant] stock, 'creat[ing] a false impression of how market participants value a security.'" Id. (quoting ATSI, 493 F.3d at 101).

The Second Circuit recently reiterated this rule in Set Capital LLC v. Credit Suisse Group AG, 996 F.3d 64 (2d Cir. 2021). In Set Capital, the plaintiffs alleged Credit Suisse made hedging trades — like the trades in this case — as part of a scheme to depress the price of exchange traded notes ("ETNs") that Credit Suisse issued. See id. at 69-74, 77. Credit Suisse argued the plaintiffs failed to "allege any 'artificial' impact on the price of [the ETNs] because its hedging trades were 'done openly' for the legitimate purpose of 'manag[ing] risk,' not deceiving investors." Id. at 77. The Set Capital court recognized "it is generally true that short selling or other hedging activity is not, by itself, manipulative," but "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." Id. The Second Circuit held that "the complaint alleges more than routine

hedging activity: It alleges that Credit Suisse flooded the market with millions of additional [ETNs] for the very purpose of enhancing the impact of its hedging trades and collapsing the market for the notes." Id.

Gorman argues the preceding cases stand for the proposition that "[o]pen-market trades are manipulative only when they have *no* legitimate purpose and are motivated *solely* by an intent to move prices." ("Reply," Dkt. No. 17 at 2.) Gorman principally relies on the following line in Masri: "if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and *not for any legitimate economic reason*, it can constitute market manipulation." 523 F. Supp. 2d at 372 (emphasis added). Gorman also contends this Court in Sharrette found Masri's rule that "any legitimate economic reason" negates liability for open-market manipulation is consistent with ATSI, and that this Court in turn applied Masri's rule. Gorman misreads this line of precedent.

The Second Circuit has twice analyzed this issue and never expressed a categorical rule that open-market manipulation is actionable only when there is no legitimate economic purpose for the open-market transaction. See Set Cap., 996 F.3d at 77 ("Open-market transactions that are not inherently manipulative may constitute manipulative activity

35

when accompanied by manipulative intent."); <u>ATSI</u>, 493 F.3d at 101 ("To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security."). The <u>Set Capital</u> court explicitly considered the argument that "hedging trades were 'done openly' for the legitimate purpose of 'manag[ing] risk,' not deceiving investors," and still found the hedging trades in that case were manipulative because plaintiffs adequately alleged manipulative intent. <u>Set Cap.</u>, 996 F.3d at 78.

Furthermore, in <u>Sharette</u>, this Court found <u>Masri</u> consistent with <u>ATSI</u> to the extent <u>Masri</u> found "open-market transactions that are not, in and of themselves, manipulative or illegal, may constitute manipulative activity within the meaning of Section 10(b) when coupled with manipulative intent." 127 F. Supp. 3d at 82. Although the <u>Masri</u> court reached its decision after <u>ATSI</u>, the <u>Masri</u> court did not base its conclusion on <u>ATSI</u>, let alone even cite <u>ATSI</u>. <u>See Masri</u>, 523 F. Supp. 2d 631. In turn, this Court does not read <u>ATSI</u> and <u>Set Capital</u> any further than stating that an open-market transaction can be manipulative when there is intent to manipulate. <u>See Set Cap.</u>, 996 F.3d at 78; <u>ATSI</u>, 493 F.3d at 101; <u>see also Amaranth</u>, 587 F. Supp. 2d at 534 (finding "a legitimate transaction combined with an improper motive is

36

commodities manipulation"). Gorman's open-market trades of Ten-Year Swaps Spreads may therefore support a manipulation claim under Section 6(c)(1) and Rule 180.1(a) if the Complaint adequately alleges Gorman intended to manipulate the price.

   b. <u>Gorman's Open-Market Trades</u>

   To reiterate, Gorman argues that his trades of Ten-Year Swap Spreads did not create an "artificial price" because his "trades had the legitimate economic purpose" of hedging the Bank's risk on the contemporaneous Issuer Swap. (Mot. at 2.) Gorman highlights the CFTC's allegations that "'[he] estimated, prior to the Pricing Call,' the amount of [Ten-Year Swap Spreads] he could sell to hedge his risk," and that Gorman's trading was "largely consistent with the alleged instruction he had received" from the Desk Head. (<u>Id.</u> at 3.) Accepting all factual allegations in the Complaint as true and construing all reasonable inferences in the CFTC's favor, the Court is unpersuaded by Gorman's arguments.

   The Complaint plausibly alleges Gorman planned and timed his trades with the purpose and effect of creating an artificial price for Ten-Year Swap Spreads. First, the Complaint states that Gorman traded through the SEF Firm's U.S. office because it "had the screen" and Gorman "only care[d] who can move the screen the quickest." (Compl. ¶ 29.) The CFTC alleges Gorman "explained that if the [19901 Screen]

had been controlled by brokers in the SEF [Firm's] U.K. office, he would have traded through a broker in the U.K." (Id.)

Second, Gorman allegedly discussed with the Desk Head how Gorman could get the price down. Gorman noticed the price for Ten-Year Swap Spreads was increasing, which made the Issuer Swap less profitable for the Bank. (See id. ¶¶ 32-33.) But Gorman told the Desk Head he would "get the print at 13.25 [BPS]." (Id. ¶ 33.) In response, the Desk Head told Gorman he was not going to get the price to that level, and repeatedly advised Gorman to decrease the amount he was selling. (See id. ¶ 33-34.)

Third, the CFTC alleges Gorman's trades during the Pricing Call were economically irrational because the Bank would lose money on the trades, except in one crucial respect: the trades avoided greater losses for the Bank on the Issuer Swap. The trades were irrational in part because Gorman and the Desk Head could sell Ten-Year Swap Spreads at a greater price later on — i.e., after the Pricing Call — since they expected the price to increase. (See id. ¶ 35.) Nonetheless, Gorman sold hundreds of millions of Ten-Year Swap Spreads during the Pricing Call, which means Gorman sold the Ten-Year Swap Spreads at a lower price while buying the Issuer Swap at a higher price. (See id. ¶¶ 35, 51-52.) This trading pattern

38

guaranteed the Bank would lose money on the Ten-Year Swap Spreads. (See id. ¶¶ 35, 52.) The silver lining, of course, is that Gorman's trades curbed even greater Bank losses on the Issuer Swap. (See id. ¶¶ 52-53.)

Lastly, the price of Ten-Year Swap Spreads was increasing before the Pricing Call, but Gorman's trading immediately before and during the Pricing Call moved the price. The CFTC alleges that in the hour and a half before the Pricing Call, the price on the 19901 Screen moved up from 13 BPS to 13.75 BPS, (see id. ¶ 37), and the Broker repeatedly told Gorman there was more demand than supply, (see id. ¶¶ 39, 41-42). Nonetheless, Gorman told the Broker to execute trades at 13.5 BPS just as the Pricing Call began (1:13 a.m.), during the dry run (1:16 a.m.), and during the live pricing (1:24 a.m.). (See id. ¶¶ 42, 44, 46.) The CFTC alleges that Gorman's trade at 1:13 a.m. moved the price down from 13.75 BPS to 13.5 BPS, and the latter two trades kept the price at that level. (See id. ¶¶ 42, 44, 46.) And importantly, Gorman made the latter two trades immediately before quoting the price during the dry run and live pricing. (See id. ¶¶ 44, 47.) According to the Complaint, when Gorman stopped trading the price immediately increased for over 18 hours before returning to 13.5 BPS. (See id. ¶ 49.)

In the end, the CFTC plausibly alleges Gorman intentionally planned and timed his trades with the purpose and effect of creating an artificial price for Ten-Year Swap Spreads. The Complaint sums up the above allegations simply: "Because Gorman saw that market prices were rising, because he traded in spite of the Desk Head's warning not to 'fight the spreads,' and because he intended to move prices down, against the market, Gorman intended to cause an artificial price for Ten-Year Swap Spreads with his trading." (Id. ¶ 38.) The Court therefore finds the CFTC has plausibly alleged a scheme liability claim under Rule 180.1(a)(1) and (3).

Gorman also argues that the present case is the CFTC's latest attempt to expand decades of manipulation precedent. In particular, Gorman relies on CFTC v. Wilson, No. 13 Civ. 7884, 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), where the court found the CFTC failed to establish the relevant "prices were artificially high" and described the CFTC's arguments as "conflat[ing] artificial prices with the mere intent to affect prices." 2018 WL 6322024. Wilson is distinguishable at this stage because that court reached its conclusion after a four-day bench trial and with the benefit of a full record. See id. at *1. This Court, however, is evaluating the Complaint on a Rule 12(b)(6) motion, where the allegations must be taken as true and reasonable inferences must be read

in the CFTC's favor. <u>See</u> <u>Dane</u>, 974 F.3d at 188. While conceivably the CFTC's claims could ultimately fail under a fuller record created on a summary judgment motion or at trial, the Complaint pleads facts sufficient to survive Gorman's motion to dismiss.

For the reasons stated above, the CFTC has plausibly alleged Gorman intended to and did create an artificial price for Ten-Year Swap Spreads in violation of Section 6(c)(1) of the CEA and Rule 180.1(a)(1) and (3).

### 2. <u>Misstatements or Omissions - Rule 180.1(a)(2)</u>

To establish a misstatement or omission claim under Rule 180.1(a)(2), the CFTC must allege Gorman "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." <u>SEC v. Simeo</u>, No. 19 Civ. 8621, 2021 WL 4041562, at *7 (quoting <u>SEC v. Frohling</u>, 851 F.3d 132, 136 (2d Cir. 2016)) (analyzing misstatement or omission claim under Section 10(b) and Rule 10b-5).

The CFTC alleges Gorman made the following material omissions when Gorman twice quoted the price at 13.5 BPS during the Pricing Call:

>    (1)    The number of bids in the market for Ten-Year
>           Swap Spreads or that the price was rising because
>           of heavy buying interest;

(2)     The only reason that the price was 13.5 BPS was because Gorman traded to depress the price;

(3)     Gorman deliberately traded through the Broker in the SEF Firm's U.S. office because that office would move the 19901 screen "the quickest"; and

(4)     Gorman was trading Ten-Year Swap Spreads to help the Bank buy the Issuer Swap at a lower price, and not because he legitimately wanted to trade.

(See id. ¶ 54.) The CFTC alleges the Issuer would have wanted to know this information because "the Issuer would have considered what steps it could take to prevent the resulting lower prices from being used to price the Issuer Swap." (Id. ¶ 55.) Gorman's scheme was also allegedly deceptive to other market participants. (Id. ¶ 56.)

Gorman raises two arguments to contend that the CFTC failed to allege a violation of Rule 180.1(a)(2). First, Section 6(c)(1) and Rule 180.1 both explicitly disclaim any duty of disclosure, and therefore Gorman did not violate Rule 180.1 by not disclosing his trading or other market conditions. (See Mot. at 1–2.) Second, Gorman argues the CFTC failed to allege that the information he did not disclose was material to the Issuer or other market participants. (See Reply at 3.)

a. Duty to Disclose Information

Section 6(c)(1) and Rule 180.1 both state they shall not require "any person to disclose to another person nonpublic information that may be material to the market price, rate,

42

or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect." 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(b). When it promulgated the final Rule 180.1, the CFTC advised that "it is not a violation of final Rule 180.1 to withhold information that a market participant lawfully possesses about market conditions." CFTC Final Rule, 76 Fed. Reg. at 41,402 (emphasis added). Put differently, the CFTC concluded that "silence, absent a pre-existing duty to disclose, is not deceptive within the meaning of final Rule 180.1." Id. Further, Rule 180.1 "does not create an affirmative duty of disclosure (except, as provided by section 6(c)(1), 'as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect')." Id. at 41,403 (emphasis added). The text of Section 6(c)(1) and Rule 180.1 is clear that those provisions do not create an affirmative duty, but a duty may exist "as necessary to make any statement . . . not misleading in any material respect." See 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(b).

The texts of Section 6(c)(1) and Rule 180.1(b) are in harmony with securities law. Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all

material information." In re Hebron Tech. Co. Sec. Litig.,
No. 20 CIV. 4420, 2021 WL 4341500, at *9 (S.D.N.Y. Sept. 22,
2021) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563
U.S. 27, 44 (2011)). But courts have long recognized the
absence of an independent duty is not "a defense to Rule 10b-
5 liability because upon choosing to speak, one must speak
truthfully about material issues." Caiola v. Citibank, N.A.,
New York, 295 F.3d 312, 331 (2d Cir. 2002). In securities
law, when someone "speaks on an issue or topic, there is a
duty to tell the whole truth, even when there is no existing
independent duty to disclose information on the issue or
topic." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 258
(2d Cir. 2016) (quotations and alterations omitted). In this
sense, "Rule 10b-5 creates a statutory duty to speak the full
truth when a defendant undertakes to say anything." In re
Bank of Am. Corp. Sec., Derivative, & ERISA Litig., 757 F.
Supp. 2d 260, 295 (S.D.N.Y. 2010) (quoting In re Credit Suisse
First Bos. Corp. Sec. Litig., No. 97 Civ. 4760, 1998 WL
734365, at *6 (S.D.N.Y. Oct. 20, 1998)).

Courts in turn recognize that someone commits securities
fraud by stating half-truths, which are "literally true
statements that create a materially misleading impression."
Set Cap., 996 F.3d at 85 (quoting Wilson v. Merrill Lynch &
Co., 671 F.3d 120, 130 (2d Cir. 2011)). Additionally,

"[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." <u>United States v. Regan</u>, 937 F.2d 823, 829 (2d Cir. 1991) (quoting <u>United States v. Charnay</u>, 537 F.2d 341, 351 (9th Cir. 1976)) (affirming Section 10(b) and Rule 10b-5 convictions of defendants who failed to disclose their scheme to depress stock prices). As a result, [w]here a defendant engages in market manipulation or a scheme to defraud in violation of Rule 10b-5(a) or (c), that misconduct creates a duty to disclose." <u>Absolute Activist Master Value Fund, Ltd. v. Ficeto</u>, No. 09 Civ. 8862, 2013 WL 1286170, at *8 (S.D.N.Y. Mar. 28, 2013).[14] Failure to disclose a manipulative scheme may support a fraud claim because the omission deprives a counterparty of the "presumption that [others] were acting legally." <u>Id.</u>

There is no independent duty of disclosure under Section 6(c)(1) and Rule 180.1, but the text of the statute and rule are clear that a duty of disclosure exists "as necessary to make any statement made to the other person in or in

---

[14] <u>See also</u> <u>In re UBS Auction Rate Sec. Litig.</u>, No. 08 Civ. 2967, 2010 WL 2541166, at *27 (S.D.N.Y. June 10, 2010) (noting that failure to disclose market manipulation creates an independent duty to disclose because "participants in the securities markets are entitled to presume that all of the actors are behaving legally" (quoting <u>In re Initial Pub. Offering</u> Sec. Litig., 241 F. Supp. 2d 281, 381-82 (S.D.N.Y. 2003))).

connection with the transaction not misleading in any material respect." See 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(b). This clause comports with the principle in securities law that when someone "speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic." Vivendi, 838 F.3d at 258 (quotations and alterations omitted). Therefore, under Section 6(c)(1) and Rule 180.1, when someone speaks about a swap transaction there is an attendant duty to tell the whole truth about the transaction, and failure to disclose complete and accurate information may support a misrepresentation or omission claim. See id.; Set Cap., 996 F.3d at 85; Regan, 937 F.2d at 829; Absolute Activist, 2013 WL 1286170, at *8.

The Complaint plausibly alleges that Gorman's price quotations during the Pricing Call were half-truths that created a duty for him to disclose his trading. Gorman twice quoted the price for Ten-Year Swap Spreads, but failed to disclose the details of the alleged trading scheme to depress the price to benefit the Bank in the Issuer Swap. (See Compl. ¶¶ 44, 47, 54.) The Issuer relied on Gorman's half-truth to price the Issuer Swap, and as a result the Issuer was deprived of the presumption that Gorman was acting legally and that the price was controlled by the natural forces of supply and

demand. (See id. ¶¶ 53–55.) The CFTC further alleges that the Issuer would have wanted to know about Gorman's trading because the Issuer would have considered what it could do to prevent the lower prices from being used to price the Issuer Swap. (See id. ¶ 55.) But without this information, the Issuer could not make an informed decision about how to best proceed with the Bond Issuance and Issuer Swap. (See id.)

   b. Materiality

   Evaluating the materiality of a misstatement or omission is an inherently fact-specific finding "that is satisfied when a plaintiff alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions." Litwin v. Blackstone Grp. L.P., 634 F.3d 706, 716–17 (2d Cir. 2011) (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 161–62 (2d Cir. 2000)); see also Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988). Since materiality is a mixed question of law and fact, a complaint should not be dismissed on a Rule 12(b)(6) motion "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quoting Ganino, 228 F.3d at 162).

47

Gorman argues his statements during the Pricing Call abided by a script written by the Issuer and he was not permitted to deviate from the script. (See Reply at 3.) In other words, according to Gorman, if the Issuer wanted to know the omitted information, it could have added relevant questions to the Pricing Call script. (See id.) But the Complaint does not allege any facts about the Pricing Call script, and Gorman has not provided a basis for taking judicial notice of the script. See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) ("Although the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b)(6) motion to dismiss, we have acknowledged that the court may also consider matters of which judicial notice may be taken." (quotations and citations omitted)).[15] It is therefore inappropriate to consider the relevance of the Pricing Call script in deciding the Motion. Factual arguments about the Pricing Call script are more appropriate for consideration on a motion for summary judgment, at which point Gorman may raise his arguments again.

---

[15] Courts may take judicial notice *sua sponte*, but only of facts that are "not subject to reasonable dispute" because it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot be questioned." Fed. R. Evid. 201. The Pricing Call script does not fit in either category.

Taking the Complaint's allegations as true and reading all reasonable inferences in the CFTC's favor at this stage, the Court finds the CFTC adequately alleges Gorman failed to disclose material information to the Issuer. As noted above, the Complaint alleges the Issuer would have wanted to know about Gorman's trading to move the price of Ten-Year Swap Spreads so the Issuer could take any steps to prevent the lower prices from being used to price the Issuer Swap. (Compl. ¶ 55.) But the Issuer did not know this information and could not make an informed decision on how to proceed with the Bond Issuance and Issuer Swap. (Id.) These allegations raise an inference that Gorman's omissions were material.

For the reasons stated above, the CFTC has plausibly alleged Gorman had a duty to disclose the material details about his scheme to manipulate the price for Ten-Year Swap Spreads, and the failure to disclose that information constituted a material omission, in violation of Section 6(c)(1) of the CEA and Rule 180.1(a)(2).

B. <u>ATTEMPTED PRICE MANIPULATION</u>

The CFTC also alleges that Gorman's conduct amounts to attempted price manipulation, in violation of Sections 6(c)(3) and 9(a)(2) of the CEA and Rule 180.2. Section 6(c)(3) provides that "it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the

49

price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 9(3). Section 9(a)(2) makes it unlawful, in relevant part, for "[a]ny person to . . . attempt to manipulate the price" of "any swap." 7 U.S.C. § 13(a)(2). And Rule 180.2 states it is "unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 17 C.F.R. § 180.2.

"To prove an attempted manipulation claim, the CFTC must establish: (1) an intent to affect the market price of a [swap]; and (2) some overt act in furtherance of that intent." Parnon, 875 F. Supp. 2d at 249. The intent element of an attempted manipulation claim, which requires pleading the defendant "acted (or failed to act) with the purpose or conscious object of causing or [a]ffecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." Parnon, 875 F. Supp. 2d at 249. As on the earlier argument, Gorman contends that he lacked the requisite intent to manipulate the price for Ten-Year Swap Spreads. For the same reasons the Complaint plausibly alleges that Gorman intended to and did create an artificial price for Ten-Year Swap Spreads, the Court finds the CFTC plausibly

alleges Gorman attempted to manipulate the price of Ten-Year Swap Spreads in violation of the CEA.

For the reasons stated above, the CFTC has plausibly alleged Gorman attempted to manipulate the price of Ten-Year Swap Spreads in violation of Sections 6(c)(3) and 9(a)(2) of the CEA and Rule 180.2.

### ORDER

For the reasons stated above, it is hereby

**ORDERED** that John Patrick Gorman III's ("Gorman") motion to dismiss the Amended Complaint (Dkt. No. 14) is **DENIED**; and it is further

**ORDERED** that Gorman shall file and serve an answer to the Complaint within fifteen (15) days of the date of this Order.


**SO ORDERED.**

Dated:      February 28, 2022
            New York, New York

_____
Victor Marrero
U.S.D.J.