**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/24/2023
```

---

COMMODITY FUTURES TRADING COMMISSION,

                     Plaintiff,

          - against -

JOHN PATRICK GORMAN III,

                    Defendant.

**21 Civ. 870 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") brings this action against defendant John Patrick Gorman III ("Gorman") asserting violations of the Commodity Exchange Act ("CEA") and the CFTC's regulations promulgated thereunder. (See "Complaint" or "Compl.," Dkt. No. 1.) Now before the Court is Gorman's renewed, fully briefed Motion to Dismiss Counts One and Two of the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (See "Motion" or "Mot.," Dkt. No. 43; "Br.," Dkt. No. 44.) For the reasons stated below, the Motion is **DENIED,** in part, and **GRANTED,** in part.

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND

The Court assumes the parties are familiar with the facts alleged in the Complaint and so provides only a high-level summary of the key factual allegations. For a complete

recitation, the Court refers to and incorporates the factual background as set forth in the Court's previous Order in this matter. See CFTC v. Gorman, 587 F. Supp. 3d 24, 29-38 (S.D.N.Y. 2022) ("Gorman I").[1]

The CFTC alleges Gorman engaged in a scheme to manipulate the price of Ten-Year Swap Spreads while working as a managing director and U.S. Dollar swaps trader on the swaps desk for a global investment bank. While working for that bank in Tokyo, Japan, Gorman represented the bank's Japanese Affiliate (the "Bank") during an interest rate swap transaction ("Issuer Swap") between the Bank and a Japan-based bond issuer (the "Issuer"), during which the Issuer would issue U.S. dollar-denominated bonds with a ten-year maturity and a notional value of $1 billion (the "Bond Issuance").

The core of the CFTC's claims involves events that occurred leading up to and during the Pricing Call. At that time, the prices of the Issuer Swap and Bond Issuance would be set based on the then-current price for Ten-Year Swap Spreads that were displayed on a particular trading screen

---

[1] Except as otherwise noted, the following background derives from the Complaint. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to the plaintiff, as required under the standard set forth in Rule 12(b)(6) and explained in Section II of Gorman I, 587 F. Supp. 3d at 38-39. Unless otherwise noted, all defined terms used in Gorman I retain their meaning here.

(the "19901 Screen") that was operated by a swap execution facility broker firm ("SEF Firm"). Although the SEF Firm had locations in both the United Kingdom and the United States, the CFTC alleges that Gorman chose to trade through a United States-based broker, a choice that was atypical for him, because the U.S. office "had the screen" -- referring to the 19901 Screen -- and thus could change the price displayed on "the screen the quickest." (Compl. ¶ 29.)

The CFTC alleges that, before the Pricing Call, Gorman and the Bank's head of the swaps desk ("Desk Head") knew that there was a large amount of buying interest in Ten-Year Swap Spreads and that, due to the increased demand and smaller supply, prices were increasing. Gorman described to the Desk Head, via text messages on their personal phones, a plan to get the price of Ten-Year Swap Spreads down to 13.25 BPs[2] during the Pricing Call. Gorman could generate greater profits for the Bank by helping the Bank buy the Issuer Swap at the lowest possible price. The Desk Head warned Gorman to not "waste to[o] many bullets" -- i.e., not sell too many Ten-Year Swap Spreads -- trying to get the price to 13.25 BPs, because the Bank could also generate profits by selling

---

[2] BPs, or basis points, is a unit of measure for interest rates. One basis point equals one-one hundredth of a percent. For example, an interest rate increase from 1.45% to 1.48% equates to an increase of three BPs or 0.03%.

Ten-Year Swap Spreads as prices rose throughout the day, a trend that both Gorman and the Desk Head expected. (Id. ¶¶ 33-34 and n.5.) The Desk Head was skeptical that Gorman could get the price down to 13.25 BPs. The Desk Head texted Gorman that Gorman was "not gonna get 10s down at 13.25," since there were "too many buyers." (Id. ¶ 33.)

Gorman set up a direct line with the Broker at the SEF Firm during the Pricing Call. The SEF Firm's Broker could provide Gorman real-time information about supply and demand for Ten-Year Swap Spreads, information that would not be disclosed on the 19901 Screen, and thus unavailable to the Bank or the Issuer during the Pricing Call.

As the Pricing Call began and throughout its duration, Gorman traded Ten-Year Swap Spreads through the SEF Firm's Broker. When Gorman made trades, the price displayed on the 19901 Screen changed. Gorman first traded when the Pricing Call began to move the price displayed on the 19901 Screen from 13.75 BPs down to 13.5 BPs. Then, when the dry run for the Issuer Swap pricing began, Gorman again traded at 13.5 BPs and quoted the price for Ten-Year Swap Spreads on the call as 13.5 BPs.

After quoting the price during the dry run, Gorman sold more Ten-Year Swap Spreads at 13.75 BPs -- an increase from Gorman's three previous trades at 13.5 BPs. After Gorman sold

at 13.75 BPs, the 19901 Screen displayed 13.75 BPs as the price for Ten-Year Swap Spreads.

When the live pricing began, during which the price for the Issuer Swap and Bond Issuance would be set in stone, Gorman sold more Ten-Year Swap Spreads at 13.5 BPs, again moving the price displayed on the 19901 Screen from 13.75 BPs down to 13.5 BPs. Gorman then quoted the price for Ten-Year Swap Spreads as 13.5 BPs, and the other participants on the Pricing Call agreed that 13.5 BPs was the price displayed on the 19901 Screen and would be the figure used to price the Issuer Swap. Gorman disclosed only the price to the participants on the Pricing Call despite knowing from the SEF Firm's Broker that there were more bidders than sellers in the Ten-Year Swap Spread market.

After Gorman quoted the price at 13.5 BPs, he sold more Ten-Year Swap Spreads at 13.75 BPs before telling the SEF Broker he wanted to stop selling entirely. The CFTC alleges that "[o]nce Gorman stopped selling for the purpose of moving the price of Ten-Year Swap Spreads on the 19901 [S]creen down to 13.5 [BPs], the price on the 19901 [S]creen immediately rose and for over 18 hours did not return to the 13.5 level to which Gorman's trading had moved it." (Compl. ¶ 49.)

B.   <u>PROCEDURAL HISTORY</u>

Consistent with the Court's Individual Practices, on May 21, 2021, Gorman wrote to the CFTC regarding an anticipated motion to dismiss Counts One and Two of the Complaint under Rule 12(b)(6). (<u>See</u> Dkt. No. 14.) The CFTC opposed the pre-motion letter, and the parties exchanged another two letters setting forth their respective arguments on the dispute. (<u>See</u> Dkt. Nos. 16-18.) The Court then construed Gorman's May 21 letter as a motion to dismiss under Rule 12(b)(6) and denied Gorman's motion on the basis of the pre-motion letters and the pertinent materials in the record. <u>See</u> <u>Gorman I</u>, 587 F. Supp. 3d 24.

On March 14, 2022, Gorman moved for reconsideration of the Court's Order in <u>Gorman I</u>. (<u>See</u> Dkt. Nos. 24-25.) The CFTC also submitted a letter identifying one aspect of <u>Gorman I</u> that the Court might consider modifying related to the proper standard to apply to alleged violations of 17 C.F.R. Section 180.1 ("Rule 180.1") in contrast to the standard applied to claims arising under 17 C.F.R. Section 180.2 ("Rule 180.2"). (<u>See</u> Dkt. No. 26.) After considering further briefing from both parties on whether reconsideration or modification of <u>Gorman I</u> was appropriate, as well as the standard for manipulation under Rule 180.1 (<u>see</u> Dkt. Nos. 33-

36), the Court granted the Motion for Reconsideration (see Dkt. No. 39).

The Court's Order directed Gorman to "file a full motion to dismiss." (Id.) It further explained that "[a]t the conclusion of the parties' briefing on Gorman's proposed motion, the Court will determine whether dismissal is warranted, and whether to modify the Court's prior Decision and Order [(i.e., Gorman I)] regarding the elements necessary to establish liability under CFTC [Rule] 180.1(a)(1) and (3)." (Id.) Gorman filed his Motion and accompanying materials on September 30, 2022. (See Mot.; Br.) The CFTC filed its Opposition on November 18, 2022. (See "Oppo.," Dkt. No. 50.) And Gorman filed his Reply on December 9, 2022. (See "Reply," Dkt. No. 52.)

## II.   **LEGAL STANDARD**

The Court refers to and applies the legal standard on a Motion to Dismiss under Rule 12(b)(6) as articulated in Gorman I, including the relevant application of Federal Rule of Civil Procedure 9(b). See Gorman I, 587 F. Supp. 3d at 38-39.

## III. **DISCUSSION**

A.   ELEMENTS OF MANIPULATION UNDER RULES 180.1 AND 180.2

Rule 180.1(a)(1) and (3) make it unlawful

for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on

or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . [or]

(3) Engage, or attempt to engage, in any act, practice or course of business, which operates or would operate as a fraud or deceit upon any person[.][3]

17 C.F.R. §§ 180.1(a)(1), (3). In assessing whether the CFTC sufficiently pled "scheme liability" under Regulation 180.1(a)(1) and (3) in Gorman I, this Court articulated the standard as requiring the CFTC to allege that Gorman "(i) committed a manipulative or deceptive act, (ii) in furtherance of the alleged scheme, and (iii) with scienter." 587 F. Supp. 3d at 40 (citing SEC v. Sason, 433 F. Supp. 3d 496, 508-09 (S.D.N.Y. 2020)). Then, because the manipulative or deceptive act alleged was Gorman's "open market manipulation" of the price of Ten-Year Swap Spreads, the Court explained that the CFTC must also show that "(1) Defendant[] possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendant[] caused the artificial prices; and (4) Defendant[] specifically intended to cause the artificial price." Id. at 41 (citing In re

---

[3] Rule 180.2 is titled "Prohibition on Price Manipulation" and makes it unlawful "for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 17 C.F.R. § 180.2.

Amaranth Nat. Gas Commodities Litig., 730 F.3d 170, 173 (2d Cir. 2013)).

The CFTC argues that this articulation of the standard for manipulation is incorrect as to Rule 180.1 and CEA Section 6(c)(1) ("Section 6(c)(1)"), see 7 U.S.C. § 9(1), because it requires the CFTC to allege Defendant had an intent to create an artificial price. (See Oppo. at 8 and n.4.) The CFTC posits that, in alleging fraud-based manipulation and/or attempt under Rule 180.1(a)(1) and (3), a party need not allege, nor a Court find, intent to create an artificial price. The CFTC points to statements in the preamble of its Final Rule explaining that Rule 180.1 "implements the provisions of CEA section 6(c)(1) by prohibiting, among other things, manipulative and deceptive devices, i.e., fraud and fraud-based manipulative devices and contrivances employed intentionally or recklessly, *regardless of whether the conduct in question was intended to create or did create an artificial price*." (Id. at 8 (citing Final Rule, 76 Fed. Reg. 41398 (Jul. 14, 2011) (emphasis in original)).) The CFTC differentiates this conduct from non-fraud-based manipulation and attempt brought under Rule 180.2 and CEA Section 6(c)(3), see 7 U.S.C. § 9(3), where the Commission determined that it would apply the "traditional four-part test for manipulation," including "that the accused specifically

intended to create or effect a price or price trend that does not reflect legitimate forces of supply and demand." 76 Fed. Reg. at 41407.

Gorman attacks the CFTC's position. Broadly referring to the term of art, "manipulation," Gorman argues that in all such cases under the CEA, the CFTC must allege, and a Court must find, that the defendant intended to create or did create an artificial price. Gorman states that "[c]laims for manipulation and attempted manipulation have the common fundamental element of an intent to create an artificial price" (Br. at 8 n.4) and that any assertion to the contrary "is flatly contradicted by case law the CFTC itself relies on." (Reply at 2 n.2 (citing CFTC v. Parnon Energy Inc., 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012)).)

The Court finds that in these arguments, to varying degrees, both parties are right and both parties are wrong. The CFTC is correct that, in the abstract, it will not always need to allege an intent to create an artificial price when claiming fraud in connection with a swap or other commodity under Rule 180.1(a)(1) and (3). But Gorman is also correct that, insofar as the Commission alleges price manipulation as the underlying manipulative act, the Commission will need to also allege a specific intent to create an artificial price. The Court is not persuaded that there is any need to modify

the standard it articulated and applied in <u>Gorman I</u>. It does, however, take the opportunity to review its analysis of the issue.

The dispute here centers around the text of the two Rules and the somewhat casual use of the word "manipulate" in each. While Courts generally must give the same word the same meaning throughout a given statutory or regulatory text, <u>see</u> <u>United States v. Castleman</u>, 572 U.S. 157, 174 (2014) (Scalia, J., concurring) (describing the "presumption of consistent usage [canon] -- the rule of thumb that a term generally means the same thing each time it is used" in the same statute or regulation), the Court is persuaded that the difference in the syntactical use of "manipulative" as between Rules 180.1 and 180.2 (i.e., "manipulative" versus "manipulation," respectively) combined with the words that those forms modify ("devices" versus "price," respectively) signifies an intent that those words have slightly different meanings, which in turn, suggests that different standards apply to each.

This notion is borne out by the CFTC's interpretation of Rules 180.1 and 180.2.[4] In adopting the Final Rule, the Commission made clear that its intent, as well as the intent

---

[4] To the extent that the Court must give deference to the Commission on the standard to apply, the Court is unpersuaded that its articulation of the standard, set forth in <u>Gorman I</u> and here, is inconsistent with the Commission's interpretation.

of Congress, was to maintain a delineation between Rule 180.1 and 180.2. In response to comments that the Commission should consolidate Rules 180.1 and 180.2, the Commission explained that for Rule 180.2 "a person must act with the requisite specific intent," to manipulate or attempt to manipulate *the price* of a commodity, which the Commission found "necessary to ensure that legitimate conduct is not captured by Rule 180.2, which covers [only] non-fraud based manipulation." 76 Fed. Reg. at 41407 (emphasis added). The Commission explained further that due to the "difference in scope of application between the final Rules [180.1 and 180.2]," the "Commission decline[d] the requests to consolidate them." Id.

That delineation exists, as the Court perceives it, only at the highest levels of each Rule's application. The difference between Rules 180.1 and Rule 180.2 encompasses, essentially, who or what is being manipulated. Focusing only on where the term arises in each Rule, Rule 180.1 targets the "use or employ[ment], or attempt[ed] use or employ[ment]" of "any manipulative device . . . to defraud" *someone* or *something* "in connection with" a commodity. 17 C.F.R. § 180.1(a)(1). Thus, Rule 180.1 broadly targets any fraudulent device used or attempted to be used with respect to commodities. As a result, one of those manipulative devices, among the others a fraudster may use, could be the

manipulation of the price of a commodity to defraud an investor.

Rule 180.2, on the other hand, is more granular. It targets only manipulation or attempted manipulation of "*the price*" of a commodity -- as opposed to a person -- regardless of any deceit or fraud. 17 C.F.R. § 180.2 (emphasis added). Such non-fraud-based manipulation could simply be the aggregation and abuse of market power sufficient to move the market against the prevailing financial markets' tides. See Parnon Energy Inc., 875 F. Supp. 2d at 244 (finding "that the alleged scheme is based on the abuse of market power, rather than fraud"). Thus, the CFTC would always have to prove an intent to create an artificial price in these cases.

This interpretation aligns with the Commission's explanation that Rule 180.1 was derived, in part, from "Congress['s] grant[] [to] the Commission [of] broad new authority to prohibit 'any manipulative device or contrivance' in connection with any swap . . . ." 76 Fed. Reg. at 41401. In its determination of the Final Rule, the CFTC made clear that Rule 180.1 "requires a fraud or manipulation, or attempted fraud or manipulation, and that the fraud or manipulation or attempted fraud or manipulation, be 'in connection with'" a commodity, but not necessarily the "price" of the commodity. Id. Reiterating the point

highlighted by the CFTC in the rule's preamble, the Commission
explained that

> [t]he foregoing should not be interpreted, however, to
> mean that a violation of final Rule 180.1 necessarily
> requires proof of a market or price effect, as some
> commenters' [sic] recommend. It does not. A market or
> price effect may well be indicia of the use or employment
> of a manipulative or deceptive device or contrivance;
> nonetheless, a violation of final Rule 180.1 may exist
> in the absence of any market or price effect.

Id. Thus, it is foreseeable, and in fact was foreseen by the
Commission, that a person could employ a manipulative device
or contrivance in connection with a swap or commodity that
has no effect on the price of the commodity itself, that the
alleged fraudulent scheme was not carried out to manipulate
a price, or, as here, that the manipulation of the price of
a commodity was used to defraud an investor. In the former
two instances, it would defy logic to require the CFTC to
allege a defendant's intent to create or actual creation of
an artificial price. Rule 180.1 reaches many more
manipulative devices than those used to manipulate prices.

  That Rule 180.1 applies to broader activity is bolstered
by reference to case law interpreting Rule 180.1 and Section
6(c)(1)'s counterparts under the securities laws, Section
10(b) of the Securities Exchange Act of 1934 and Securities

and Exchange Commission Rule 10b-5.[5] For example, in <u>Lorenzo</u> <u>v. SEC</u>, the Supreme Court explained that the word, "device," as used in Section 10(b) and Rule 10b-5, "capture[s] a wide range of conduct." 139 S. Ct. 1094, 1101 (2019). That conduct includes activities beyond price manipulation. Accordingly, in the grand scheme of all the potential manipulative or deceptive devices that may be employed in connection with commodities, in violation of Section 6(c)(1) and Rule 180.1(a)(1) and (3), the CFTC is correct that it is necessary to allege only an intent to deceive or defraud. <u>See</u> <u>Set Capital LLC v. Credit Suisse Grp. AG</u>, 996 F.3d 64, 77 (2d Cir. 2021). That is the standard the Court articulated in <u>Gorman I</u> in addressing the required elements for scheme liability. <u>See</u> 587 F. Supp. 3d at 40-41.

Though the preceding discussion clearly indicates that intent to create an artificial price is not an element of a general claim for fraud under Rule 180.1(a)(1) or (3), the case law overwhelmingly suggests that Gorman is at least

---

[5] As the Court explained in <u>Gorman I</u>, there is a dearth of case law analyzing Section 6(c)(1) and Rule 180.1(a), so "courts have looked to the securities laws when called upon to interpret similar provisions of the CEA." <u>Loginovskaya v. Batratchenko</u>, 764 F.3d 266, 272 (2d Cir. 2014) (quoting <u>Saxe v. E.F. Hutton & Co.</u>, 789 F.2d 105, 109 (2d Cir. 1986)). The CFTC agrees that the securities laws guide its interpretation of the laws that apply to commodities, but notes that "[i]n promulgating Rule 180.1, the CFTC provided that, '[t]o account for the differences between the securities markets and the derivatives markets, the CFTC will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5.'" (<u>See</u> Oppo. at 9 n.5 (citing 76 Fed. Reg. at 41398)).)

correct insofar as what must be pled when the alleged manipulative act is in and of itself involving "price manipulation." In those cases, the allegations must drill down one step further and satisfy the traditional four prongs of a price manipulation claim, that is: "'(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'" Gorman I, 587 F. Supp. 3d at 41 (citation omitted). The Court took this exact approach in Gorman I.

And such an approach comports with precedent in this Circuit. In ATSI Communications, Inc. v. Shaar Fund, Ltd., in assessing a securities fraud claim, the Second Circuit explained that Section 10(b)'s prohibition on "the use of a 'manipulative or deceptive device'" reaches "material misstatements but also manipulative acts." 493 F.3d 87, 99 (2d Cir. 2007). As to "manipulative acts," the Second Circuit explicitly connected artificial prices to willful or purposeful acts, i.e., intentional acts. It stated that "case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity *aimed at* deceiving investors as to how other market participants have valued a security." Id. at 100 (emphasis added). The Second

Circuit continued that "to be actionable as a manipulative act" the otherwise potentially legitimate activity (there, short selling) "must be *willfully* combined with something more to create a false impression of how market participants value a security." Id. at 101 (emphasis added). The Second Circuit affirmed its expression of this standard most recently in Set Capital LLC, reiterating that fraud-based market manipulation requires showing "*intentional or willful* conduct designed to deceive or defraud investors by *controlling or artificially affecting* the price of securities." 996 F.3d at 76 (emphasis added).[6]

In practice, the distinction drawn above between Rules 180.1 and 180.2 will often be one without a difference. If the actual or attempted "manipulative device, scheme, or artifice," alleged to be employed to defraud the investor is, in and of itself, price manipulation (as here), then, to prove a violation under claims brought pursuant to Rule 180.2, the

---

[6] The Commission highlights the use of the word "or" between "controlling" and "artificially affecting" as evidence that artificiality is only sufficient but not necessary to show manipulation. The Court does not see how "controlling . . . the price of a security" to "distort estimates of the 'underlying economic value,'" Set Capital LLC, 996 F.3d at 76, or in a way that "does not reflect the basic forces of supply and demand," Parnon Energy Inc., 875 F. Supp. 2d at 246, is any different from "artificially affecting" the price. In this case, the more natural reading is that "or" does not create a disjunctive list, but merely separates two words with synonymous meanings when read in context of the rest of the decision. That conclusion is consistent with the Second Circuit's use of "or" as separating other synonymous words throughout that same sentence: "intentional or willful" and "deceive or defraud." Set Capital LLC, 996 F.3d at 76.

Commission will necessarily need to make allegations about the defendant's intent to create an artificial price. And no party here disputes that Rule 180.2 requires intent to create an artificial price.[7] Ultimately, the main difference between Rule 180.1 and Rule 180.2 is that, under Rule 180.1, the Commission will need, in most cases, to show only an intent to defraud, while under Rule 180.2, the Commission will always need to show an intent to create an artificial price regardless of whether that price is created through fraudulent means.[8] The exception is that where the CFTC brings the Rule 180.1(a)(1) and (3) claims as fraud based on price manipulation. Then the Commission will need to allege both.

---

[7] This conclusion applies with equal force to allegations brought under Rule 180.1(a)(3) relating to instances where the actual or attempted "act, practice, or course of business, which operates or would operate as a fraud" on an investor is price manipulation.

[8] To the extent that Gorman argues that the intent required for attempted manipulation and actual manipulation is the same, that is true. (See Br. at 2 n.2; Reply at 8 n.2.) However, Gorman's application of that argument is misplaced. Rules 180.1 and 180.2 both prohibit the actual act and the attempted act. The intent required for the actual act and the attempted act is the same, but only internally to each Rule. That intent is not transferred, in whole, across the two Rules, which must remain distinct. Gorman's reliance on CFTC v. Parnon Energy Inc. does not compel a different result as Parnon involved only a non-fraud-based manipulation scheme, i.e., under Rule 180.2, and did not discuss the interplay between the alleged scheme there and Rule 180.1. See Parnon Energy Inc., 875 F. Supp. 2d 233, 244-45 (S.D.N.Y. 2012) (noting that the Commission did "not allege that Defendants acquired and held their dominant position in a deceitful or misleading manner" or "sold their position in the cash window in a fraudulent manner").

B.   GORMAN'S ALLEGED MARKET MANIPULATION -- RULES
     180.1(a)(1), 180.1(a)(2), AND 180.2

Turning to the CFTC's allegations, the Court is not
persuaded that the Commission's application of the standard
set forth in Gorman I requires any further modification. In
his fully briefed motion, Gorman rests heavily on the argument
that manipulation cannot exist if the trading strategy was
based on legitimate economics. In sum, Gorman contends that
"[b]ecause manipulation law aims solely at preventing the
market-distorting effects of artificial prices, transactions
serving any 'legitimate economic rationale' cannot create
this harm and so cannot be reached by this claim." (Br. at
8.) Under this view, in essence, if a person accused of
manipulation can conjure up some legitimate economic
rationale, however tenuous or remote, then the actor did not
create an artificial price signal and did not manipulate the
price. The Court rejects that reading of the rule.

Here, Gorman says that the CFTC's concession that
Gorman's trades were made in part to offset the risk of the
interest rate swap -- i.e., the trades were transacted in
pursuit of a hedging strategy -- means that all of the trades
had a legitimate economic rationale and thus are not
actionable as price manipulation. The Court addressed these
arguments at length in Gorman I and is unpersuaded by the

19

additional pages Gorman devotes to them here. See Gorman I, 587 F. Supp. at 41-45. Accordingly, the Court reaffirms its conclusion that the CFTC has adequately alleged that Gorman intended to defraud the Issuer by manipulating the price of Ten-Year Swap Spreads on the 19901 Screen, and that Gorman had the intent to create an artificial price for the Ten-Year Swap Spreads used to set the price of the Issuer Swap. Thus, Gorman's motion to dismiss the CFTC's claims under Count One and Two, with respect to Sections 6(c)(1), 6(c)(3), Rules 180.1(a)(1), 180.1(a)(3), and Rule 180.2, are, again, denied. The Court takes the opportunity to clarify its reasoning as to two issues raised by Gorman.

First, the primary issue Gorman raises centers around, essentially, the use of the word "legitimate" in the various opinions that Gorman cites. Those cases make clear, however, that amidst an otherwise legitimate trading strategy, where an actor is motivated by and intends to create an artificial price, the veneer of legitimacy dissolves. See, e.g., SEC v. Masri, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (directing courts to "distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers"); CFTC v. Wilson, No. 13 Civ. 7884, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) ("[T]he CFTC

must show that Defendants intended to cause *artificial* prices -- i.e., prices that they understood to be unreflective of the forces of supply and demand.") (emphasis in original).

Accordingly, whether Gorman's strategies were "legitimate" depends not on whether hedging, in general, is a legitimate strategy, but on whether the specific trades he made to hedge his position were either "intended to anticipate and respond to prevailing market forces," Masri, 523 F. Supp. 2d at 367, or were "unreflective of the forces of supply and demand," Wilson, 2018 WL 6322024, at *15. If Gorman knew his trading strategy was unreflective of supply and demand, then the price he sought to attain for his swap trades was artificial, and any legitimate economic rationale is nullified.

The Commission alleges, in somewhat painstaking detail, exactly how Gorman's trading strategies did not reflect the natural forces of supply and demand, and exactly how he intended to "get the print" for the Issuer Swap at his desired price. See Gorman I, 587 F. Supp. 3d at 32-35; (Compl. ¶ 33.) If the Court ignores the prices at which Gorman traded, it can see how the hedging strategy had an "economic rationale," that is, offsetting the risk of the Issuer Swap and providing the best price for his client. But the crux of the CFTC's allegations is that Gorman's paint-the-tape trading pattern

transformed an otherwise legitimate activity into an illicit one. The Commission has alleged that the natural forces of supply and demand in the market for Ten-Year Swap Spreads before, during, and after the Pricing Call were causing prices to rise. They allege Gorman knew this; the Desk Head knew this; and the U.S.-based SEF Firm's Broker that Gorman specifically used to "move the screen the quickest" knew this (Compl. ¶ 4). Yet, Gorman is alleged to have intentionally timed his trades and moved the market against those trends in a way that was unreflective of genuine supply and demand, thereby intending to send a false signal to the market and the Issuer as to the price for Ten-Year Swap Spreads. See Masri, 523 F. Supp. at 367. Assuming that conduct is true, as the Court must at this stage, it amounts to textbook artificiality and unlawful manipulation.

The Commission further alleges that after trading below the prevailing market rate for the Ten-Year Swap Spreads, the price immediately rose and for 18 hours did not return to the low point (13.5 BPs) to which Gorman had moved the market. (See Compl. ¶ 49.) The Court does not agree with Gorman's reading of the cases he cites for the proposition that to find price manipulation there must be an absolute absence of any legitimate economic motive. But even if that reading were

correct, the Court cannot find any *legitimate* economic rationale supporting the conduct here.

Second, the Court is also unmoved by Gorman's appeal to the Desk Head's advice. Gorman argues that because he "either *heeded* the Desk Head's advice or traded *even more conservatively* than the Desk Head advised," that his trades were "consistent with legitimate economics." (Br. at 14 (emphasis in original).) That Gorman was able to use fewer "bullets" (Compl. ¶ 33-34) -- i.e., sell fewer tranches of Ten-Year Swap Spreads on the open market -- to reach the artificial price he sought should not be rewarded or viewed as legitimizing economic activity otherwise unjustifiable and harmful to financial markets. Accordingly, the Court reaffirms it prior decision in Gorman I as to Counts One and Two on these particular claims and denies Gorman's Motion.

    C.   MISSTATEMENTS OR OMISSIONS -- RULE 180.1(A)(2)

The CFTC also alleges that Gorman made actionable misstatements or omissions during the Pricing Call by failing to disclose material information about the price of Ten-Year Swap Spreads when he twice quoted the price to the Issuer. Because the quoted price was an accurate reflection of what was displayed on the 19901 Screen, the CFTC alleges that Gorman's statements were "half-truths" that created a duty to

disclose additional information. The information the CFTC argues Gorman should have disclosed include:

> (1) The number of bids in the market for Ten-Year Swap Spreads or that the price was rising because of heavy buying interest;
>
> (2) The only reason the price was 13.5 BPs was that Gorman traded to depress the price;
>
> (3) Gorman deliberately traded through the Broker in the SEF Firm's U.S. office because that office would move the 19901 Screen "the quickest"; and
>
> (4) Gorman was trading Ten-Year Swap Spreads to help the Bank buy the Issuer Swap at a lower price, and not because he legitimately wanted to trade.

(See Compl. ¶ 54.) The CFTC alleges that the Issuer would have wanted to know this information because "the Issuer would have considered what steps it could take to prevent the resulting lower prices from being used to price the Issuer Swap." (Id. ¶ 55.) The CFTC also alleges that Gorman's scheme was deceptive to other market participants and triggered a duty to disclose his conduct to them. (Id. ¶ 56.)

In Gorman I, this Court found that the CFTC adequately alleged that Gorman "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of [commodities]." Gorman I, 587 F. Supp. 3d at 45 (citing SEC v. Simeo, No. 19 Civ. 8621, 2021

WL 4041562, at *7 (S.D.N.Y. Sept. 3, 2021) (quoting <u>SEC v. Frohling</u>, 851 F.3d 132, 136 (2d Cir. 2016))).

In reaching its conclusion that the CFTC's allegations were sufficient, the Court was faced with only two arguments from Gorman: "First, Section 6(c)(1) and Rule 180.1 both explicitly disclaim any duty of disclosure, and therefore Gorman did not violate Rule 180.1 by not disclosing his trading or other market conditions. Second, Gorman argues the CFTC failed to allege that the information he did not disclose was material to the Issuer or other market participants." <u>Gorman I</u>, 587 F. Supp. 3d at 45.

Gorman now raises two additional arguments with the benefit of full briefing. First, Gorman argues that the CFTC's claim is impermissibly extraterritorial as Gorman's statements were made only in Japan and only to Japanese counterparties. Second, Gorman provides a basis for taking judicial notice of the pricing call script, drafted and approved by the Issuer (the "Pricing Call Script"), that instructed Gorman to quote only the price and provide no other information. The CFTC opposes both arguments and strongly disputes the propriety of taking judicial notice of the Pricing Call Script. As discussed below, the Court finds Gorman's arguments regarding extraterritoriality persuasive and grants Gorman's Motion, without prejudice, with respect

to the Rule 180.1(a)(2) claims subsumed within Count One on that ground. As a result, the Court does not reach the arguments regarding the Pricing Call Script. Further, the Court finds that Gorman owed no independent duty to disclose to the "other market participants" and dismisses those claims as well.

      1.  <u>Extraterritoriality</u>

      The CEA must be interpreted "in light of the presumption against extraterritoriality, a canon of statutory interpretation that is a 'basic premise of our legal system.'" <u>Prime Int'l Trading, LTD v. BP PLC</u>, 937 F.3d 94, 102 (2d Cir. 2019) (citing <u>RJR Nabisco, Inc. v. European Cmty.</u>, 579 U.S. 325, 335 (2016)). The CEA expressly limits the Commission's reach as it relates to swaps to domestic conduct, stating that the CEA's "provisions . . . relating to swaps . . . shall not apply to activities outside of the United States unless those activities -- (1) have a direct and significant connection with activities in, or effect on, commerce of the United States[.]" 7 U.S.C. § 2(i).[9] Further, the CEA's fraud

---

[9] Gorman points out that the Commission has previously interpreted "direct and significant" to apply to "activities outside the United States that pose risks to the U.S. financial system . . . to reduce risks of the U.S. financial system and avoid future financial crises." (Br. at 17 (citing 78 Fed. Reg. 45292, 45299–300 (Jul. 26, 2013)).) Gorman characterizes this construction as reaching only "systemic risks" to the U.S. financial system. (<u>Id.</u>) The Court agrees with Gorman's characterizations. The Commission's policy statement is directed at curbing risks like those that occurred during the 2008 Financial Crisis, where foreign affiliates

provisions, Sections 6(c)(1) and 9(a)(2), under which the Commission brings these claims against Gorman, lack "a clear statement of extraterritorial effect." <u>Prime Int'l Trading</u>, 937 F.3d at 103; <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247, 262, 265 (2010) (finding that definition of term "interstate commerce" did not rebut presumption against extraterritoriality).[10]  Statutes lacking such a "clear statement" do not apply to conduct that occurred abroad. <u>See</u> <u>Prime Int'l Trading</u>, 937 F.3d at 102. Even so, claims that state a "domestic application" of the CEA may still survive. <u>Id.</u> (citing <u>Morrison</u>, 561 U.S. at 266).

Here, the Court must determine whether Gorman's statements had a "direct and significant connection" to the United States. They did not. Nor does the Court find a proper

---

of U.S. institutions engaged in risky swap trades that "result in or contribute to substantial losses to U.S. persons and threaten the financial stability of the entire U.S. financial system." 78 Fed. Reg. at 45295. The cross-border application was thus geared towards protecting against the "failures and near failures [that] revealed the vulnerability of the U.S. financial system and economy to *systemic risk*." <u>Id.</u> (emphasis added). If the Commission is requesting that the Court defer to its interpretation of the CEA with respect to the proper standard to apply to Rule 180.1(a)(1) and (3), it cannot also ignore these statements.

[10] The conclusion reached by the Supreme Court in <u>Morrison</u>, analyzing the fraud provisions of the Securities Act, applies with the same (if not more) force here where the definition of "interstate commerce" in the CEA is significantly vaguer in application to trade between foreign countries and the United States. <u>Compare</u> 15 U.S.C. § 78c(17) ("The term 'interstate commerce' means trade, commerce, transportation, or communication . . . between any *foreign country and any State*.") (emphasis added), <u>with</u> 7 U.S.C. § 1a(30) ("The term 'interstate commerce' means commerce -- (A) between any State, territory, or possession, or the District of Columbia, and *any place outside thereof*.") (emphasis added).

"domestic application" of the statute to Gorman's statements. The claims must be dismissed.

As Gorman points out, his argument here "is simple" (Reply at 6): Gorman was in Japan when he quoted the price of the swaps at issue; the Bank was Japanese; the Issuer was Japanese; and the transaction was governed by Japanese law. (See Br. at 16-17.) Because all of the allegedly fraudulent statements were made in Japan, they lack any connection, let alone a direct and significant one, to the United States and cannot be reached by the CFTC. Further, because Gorman allegedly "engaged in fraud" by making these statements abroad, there is no domestic application of the statute.

In opposing these arguments, to establish the required connection to the United States the Commission focuses on Gorman's scheme as a whole. The CFTC argues that Gorman engaged in trades through the U.S.-based SEF Firm's Broker and manipulated the price of U.S. dollar-based Ten-Year Swap Spreads. Those trades were then booked with a U.S. swap dealer in New York. (See Oppo. at 15-17.)

The CFTC's argument impermissibly blends the underlying scheme, actionable under Rule 180.1(a)(1) and (3) and Rule 180.2, with the allegedly misleading statements made actionable only under Rule 180.1(a)(2). Rule 180.1(a)(2) makes it a violation of the rule to "[m]ake, or attempt to

make, any untrue or misleading statement of a material fact
or to omit to state a material fact necessary in order to
make the statements made not untrue or misleading." The focus
here is solely on the statements, not the underlying conduct
alleged.

Recently, in <u>In re Hain Celestial Group, Inc. Sec.
Litig.</u>, the Second Circuit highlighted the difference in
focus between the so-called "schemes, devices, or practices"
clause and the "misleading statements" clause of Rule 10b-5.
20 F.4th 131, 136 (2d Cir. 2021). Much like Rule 180.1(a)(2),
clause (b) of Rule 10b-5 renders it unlawful "[t]o make any
untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made,
in the light of the circumstances under which they were made,
not misleading." <u>Id.</u> Unlike violations of the fraudulent
schemes and devices provisions, the misleading statements
clause

> does not require that the defendant have used a
> fraudulent or otherwise illegal device, scheme,
> artifice, act, practice, or course of business. Its
> focus is rather on whether something said was materially
> misleading, either because it included a false statement
> of a material fact or because it omitted to state a
> material fact which omission rendered the things said
> misleading.

Id. In re Hain thus clearly declares that claims of misleading statements must be analyzed separately from the underlying fraudulent scheme.

a)   Direct and Significant Connection to the United States

The CFTC's extraterritoriality arguments collapse without the support of Gorman's underlying trading activity -- which neither party disputes can be reached by the CFTC. Looking at Gorman's alleged misleading statements alone, the Court cannot discern any compelling impact they produced on the U.S. financial system.

The CFTC's allegations supporting its alternative misleading statements claim is that Gorman twice quoted the price for Ten-Year Swap Spreads to the Issuer during the Pricing Call. Both times he quoted the price at 13.5 BPs. The Complaint makes clear that Gorman was trading in Japan when he quoted the price, that the Bank was the Japanese affiliate of Gorman's U.S.-based Bank, and that the Issuer was a Japan-based financial institution. Nothing in the Complaint indicates that any U.S.-based entities were on the call or were misled by Gorman's statements. The Complaint establishes just the opposite. (See, e.g., Compl. ¶¶ 7 ("Gorman spoke to the Issuer during the pricing of the Bond Issuance and Issuer Swap and quoted the price displayed on the Broker Screen"),

54 (highlighting that Gorman's statements were "deceptive to the Issuer"). Accordingly, while Gorman's trades themselves have a U.S. connection, the Court is persuaded that Gorman's statements, standing alone, lack any "direct or significant connection with activities in, or effect on, commerce of the United States" and cannot be reached by the CFTC on that basis. 7 U.S.C. § 2(i).

   b) <u>Domestic Application</u>

  The CFTC also fails to allege a proper domestic application of the statute to Gorman's allegedly misleading statements. The Second Circuit in <u>Prime Int'l Trading</u> explained that the "focus [of the CEA] is on rooting out manipulation and ensuring market integrity -- not on the geographical coordinates of the transaction." 937 F.3d at 107 (citing 7 U.S.C. § 5). It therefore "discern[ed] that Section 6(c)(1) centers on manipulation in commodities markets." <u>Id.</u> Although Gorman's actions involving trading through the U.S.-based SEF Broker to move the 19901 Screen center on manipulation in U.S.-based commodities markets, the Court does not see how, when viewed in isolation, Gorman's statements to the Issuer on the Pricing Call fall within the statute's field of view.

The Second Circuit's opinion in <u>Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE</u> is illustrative.[11] 763 F.3d 198 (2d Cir. 2014). There, plaintiffs entered securities-based swap agreements (similar to the interest-based swap agreements here) that were transacted in the United States. <u>See</u> <u>id.</u> at 206-07. Much like how the Issuer Swap here was based on the price of Ten-Year Swap Spreads, the securities-based swaps in <u>Parkcentral</u> referenced the price of Volkswagen ("VW") shares traded in European markets, and were structured as the equivalent to a short position on VW shares. <u>See</u> <u>id.</u> at 205. In other words, the plaintiffs would profit from the swaps as the value of VW shares declined. <u>See</u> <u>id.</u>

The plaintiffs' main allegations against Porsche were based on omissions made and fraudulent conduct engaged in almost entirely in Germany. They alleged that "by concealing its intention to acquire control of VW, Porsche led [plaintiffs] to conclude erroneously that the demand for VW stock was lower than it actually was" and "induced them to bet on a decline in the price of shares." <u>Id.</u> at 203. "Porsche made repeated public statements disclaiming any intention to acquire a controlling share of VM," but at the same time was buying call rights to VW shares that it could "at any moment

---

[11] <u>See also</u> <u>Prime Int'l</u>, 937 F.3d at 105 (holding that "<u>Parkcentral</u>'s rule carries over to the CEA").

exercise [] to purchase large numbers of VW shares." Id. at 204. When Porsche disclosed its plan to acquire a controlling stake in VW, "the price of VW stock began to skyrocket, leaving short-sellers scrambling to purchase the shares they needed to unwind their short sales and limit their losses." Id. at 205.

The Second Circuit affirmed the District Court's finding that Porsche's conduct was extraterritorial and could not be reached by Section 10(b) of the Securities Exchange Act, but on different reasoning. The main issue on appeal was whether the mere fact that the securities-based swap agreements were transacted in the U.S. was sufficient to establish a properly domestic claim under the statute. The Second Circuit held that while Morrison "unmistakably made a domestic securities transaction (or transaction in a domestically listed security) necessary to a properly domestic invocation of § 10(b), such a transaction is not alone sufficient to state a properly domestic claim under the statute." Id. at 215.

The factual patterns between Parkcentral and here are not perfectly aligned but, by its own terms, Parkcentral warns against "perfunctorily appl[ying its holding] to other cases based on the perceived similarity of a few facts." Id. at 217. In that way, analyzing those distinctions fortifies the Court's conclusions as to a proper domestic application of

the CEA to Gorman's statements. The distinctions are abundant. In Parkcentral, the swap agreements were all entered into in the U.S. See id. at 207 (referencing allegations that plaintiffs' investment managers transacted in the swap-agreements "from their offices in New York City" or "were acting on behalf of financial institutions located in New York"). Here, the Commission alleges that the Issuer Swap was entered into abroad, in Japan. Also different, in Parkcentral, "plaintiffs d[id] not allege that [VW shares] traded on any United States exchange," id., while here, the CFTC alleges Gorman traded the Ten-Year Swap Spreads through the U.S.-based SEF Firm, and thus affected a U.S.-based market. And in further contrast, although Porsche's "statements were made primarily in Germany, [they] were also accessible in the United States and were repeated here by the defendants," id. at 201, while Gorman's statements occurred only in Japan. These distinctions prove the rule.

The Second Circuit highlighted the following in Parkcentral, which is of critical importance here:

> a rule making the statute applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine Morrison's insistence that § 10(b) has no extraterritorial application. It would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a

> domestic transaction, even if the foreign defendants
> were completely unaware of it. Such a rule would
> inevitably place § 10(b) in conflict with the regulatory
> laws of other nations. . . . The corollary of that
> proposition is that if an application of the law would
> obviously be incompatible with foreign regulation, and
> Congress has *not* addressed that conflict, the
> application is one which Congress did not intend.

Id. at 215. Applying that rule, the Second Circuit determined

that Porsche's statements were "made primarily in Germany"

and that allowing the suit to move forward in the U.S. on

such a basis "by virtue of an agreement independent from the

reference securities" would subject foreign actors to U.S.

securities laws. Id. at 216.

Of course, not all the considerations from Parkcentral

are of concern here; unlike the European actors there, Gorman

is a U.S. citizen. But it remains true that Congress did not

address the conflict that is apparent in this dispute: alleged

misleading statements and omissions made wholly abroad to

foreign actors that arise amidst an entirely foreign

transaction. The Issuer Swap and Bond Issuance are both

Japanese transactions, and the CFTC makes no allegations that

Gorman's statements reached the U.S. Exactly as was the case

in Parkcentral, the only connection between Gorman's

statements and the U.S. is reference in the Issuer Swap to

the price of U.S. dollar Ten-Year Swap Spreads. Like in

_Parkcentral_, that link is far too tenuous to support extraterritoriality here.

While the Commission alleges that Gorman's statements induced the Issuer to enter the transaction, the statements themselves were not made for the purpose of manipulating a market -- indeed, temporally, the CFTC alleges that price manipulation was complete before Gorman uttered the quotes. There are potential conflicts between U.S. and Japanese law with respect to the required and expected disclosures around Gorman's statements of the Ten-Year Swap Spread price within the auspices of an otherwise foreign transaction, ones which Congress has not addressed.[12] Thus, even the "minor domestic element[s]" of the Issuer Swap transaction (e.g., its reference to the price of U.S. Swap Spreads appearing on the U.S.-based 19901 Screen) do not overcome "the nature of an overwhelmingly foreign transaction." _Id._

The Commission's reliance on _CFTC v. Reynolds_, No. 19 Civ. 5631, 2021 WL 796683, at *4 (S.D.N.Y. Mar. 2, 2021) and _United States v. Cornelson_, 609 F. Supp. 3d 258 (S.D.N.Y. 2022) is unpersuasive. In _Reynolds_, a default judgment decision, while defendant defrauded investors located

---

[12] For example, to the extent that the CFTC argues that, under U.S. law, Gorman may have triggered an independent duty to disclose based on his price manipulation (_see_ Oppo. at 24-25), Japanese law may have different requirements.

"worldwide," all of the relevant conduct and statements took place in the United States. 2021 WL 796683, at *2-4. Likewise, in Cornelson, the focus was on conduct that occurred in the United States and through United States-based markets and exchanges, and did not involve statements made abroad. See 609 F. Supp. 3d at 266 (distinguishing the conduct alleged with the facts of Parkcentral and finding that "[t]hese facts are a far cry from those of Parkcentral").

As a result, the Commission has "failed to plead a proper domestic application of Section 6(c)(1)" as to Gorman's statements, and Gorman's Motion is granted. Prime Int'l Trading, 937 F.3d at 108.

### 2.   Other Market Participants

Finally, the CFTC alleges that Gorman defrauded "other market participants" in violation of Rule 180.1(a)(2) by failing to disclose his trading activity. The CFTC premises its claim here with reference to the securities laws, arguing that Gorman's violations of Section 6(c)(1) and Rule 180.1(a)(1) and (3) by manipulating the price of the Ten-Year Swap Spreads triggered a duty to disclose, under Rule 180.1(a)(2), his alleged fraud to "other market participants." (Oppo. at 24-25.) Gorman counters that no duty to disclose is triggered by "open market" manipulation and that the Second Circuit has not answered the question of

whether market manipulation in and of itself triggers a duty to disclose.

The Court agrees with Gorman on this point. In Levitt v. J.P. Morgan Sec., Inc., the Second Circuit explained that it had not "address[ed] the question" of whether "the act of market manipulation itself triggers a duty to disclose." 710 F.3d 454, 467 n.9 (2d Cir. 2013). This question remains unresolved. See In re Barclays Liquidity Cross and High Frequency Trading Litig., 390 F. Supp. 3d, 449 (S.D.N.Y. 2019). The rule gleaned from the case law is that a duty to disclose based on underlying misconduct arises where the fraudster has either (1) some fiduciary or other relationship with the investor; or (2) once the accused has spoken on the issue or topic and thus must tell the whole truth. See id.; see also Levitt, 710 F.3d at 467 n.9 (noting that "courts have found that fiduciary relationships and their concomitant duty to disclose may be establish by state or federal law") (internal quotation marks and alterations omitted); Chiarella v. United States, 445 U.S. 222, 230 (1980) (expressing that with respect to silence in connection with purchase or sale of securities "such liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction"), id. at 237 (Stevens, J.,

concurring) (explaining that buyers and sellers "in the open market . . . owe[] no duty of disclosure to [each other]").

The cases cited by the Commission do not compel a different result. In <u>Absolute Activist Master Value Fund, Ltd. v. Ficeto</u>, the court found that the misrepresentations and/or omissions were actionable because they "deprived the Funds of the presumption that its managers were acting legally." No. 09 Civ. 8862, 2013 WL 1286170, at *8 (S.D.N.Y. Mar. 28, 2013). There, the Funds, composed of eight hedge funds, had a contractual relationship with the defendants that defrauded them. The trading was not done on the open market, and the statements were directed only to the Funds. And in <u>In re Initial Public Offering Sec. Litig.</u>, a pre-<u>Levitt</u> district court case, the court's conclusion that, in the Securities context, market manipulation creates a duty to disclose was premised on the notion that the securities laws are aimed at a "philosophy of full disclosure" to curb "insiders [from] conspir[ing] to frustrate the efficient function of securities markets by exploiting their position of privilege." 241 F. Supp. 2d 281, 382 (S.D.N.Y. 2003). To that end, Gorman was neither in a relationship of trust and confidence with any of the "other market participants" that would require disclosure, nor was he an "insider" who was exploiting his position of privilege to those in the market

for Ten-Year Swap Spreads. The Court is not persuaded that either case applies and finds that Gorman's alleged open market manipulation did not require disclosure to the unnamed "other market participants."

This finding is buttressed by the text of the CEA. While the CEA has a similar remedial purpose to the Securities and Exchange Act, the CEA's anti-fraud provisions demonstrate that "no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect." 7 U.S.C. § 9(1). A reasonable reading of this text is that the CEA is concerned about disclosures to "the other person" in an arms-length transaction. This reading contrasts with transactions conducted on the open market. Moreover, the CEA requires additional disclosure only once a statement has been made to that person. The Commission's Complaint contains no allegations that Gorman made any statements to "other market participants" that would require additional disclosures about his activities. Accordingly, the CFTC's "other market participants" theory of

liability as applied to Gorman's statements must be dismissed.

## IV.   ORDER

For the forgoing reasons, it is hereby

**ORDERED** that the motion of defendant James Patrick Gorman III ("Gorman") (Dkt. No. 43) to dismiss Counts One and Two of the Complaint of plaintiff Commodity Futures Trading Commission ("CFTC") is **DENIED**, in part, and **GRANTED**, in part. Gorman's motion as to the CFTC's claims in Count One brought pursuant to 7 U.S.C. Section 9(1) and, specifically, 17 C.F.R. Sections 180.1(a)(1) and (3) is **DENIED**. Gorman's motion as to the CFTC's claims in Count One brought pursuant to 7 U.S.C. Section 9(1) and, specifically, 17 C.F.R. Section 180.1(a)(2) is **GRANTED**, without prejudice. Gorman's motion to dismiss the CFTC's claims in Count Two is **DENIED**.

**SO ORDERED.**

Dated:    24 March 2023
          New York, New York

_____
          Victor Marrero
             U.S.D.J.