UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>      Plaintiff,<br><br>    v.<br><br>JOHN PATRICK GORMAN III,<br><br>      Defendant. | Case No. 21-cv-00870<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT JOHN GORMAN'S BRIEF**
<u>**REGARDING DISPUTED ISSUES**</u>

Sean Hecker
Michael Ferrara
Helen F. Andrews
Sean Kelly
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@heckerfink.com
mferrara@heckerfink.com
handrews@heckerfink.com
skelly@heckerfink.com

Katherine Epstein
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel: (212) 763-0883
kepstein@heckerfink.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ......................................................................................................................... 6

    I.    The Due Process Clause Demands That the CFTC Provide Mr. Gorman with Exculpatory Evidence in Its Possession ........................................................................... 6

    II.   The CFTC Should Be Compelled to Produce Material Within the Possession of the USAO ................................................................................................................................ 13

CONCLUSION .................................................................................................................... 15

## TABLE OF AUTHORITIES

**CASES**                                                                                        **Page(s)**

*Brady v. Maryland*,
  373 U.S. 83 (1963) ............................................................................................ *passim*

*Demjanjuk v. Petrovsky*,
  10 F.3d 338 (6th Cir. 1993) .......................................................................................... 6

*EEOC v. Los Alamos Constructors, Inc.*,
  382 F. Supp. 1373 (D.N.M. 1974) ................................................................................ 6

*In re First Guar. Metals, Co.*,
  CFTC No. 79-55, 1980 WL 15696 (July 2, 1980) ........................................................ 6

*Giglio v. United States*,
  405 U.S. 150 (1972) ........................................................................................ 5, 13, 15

*In re Murchison*,
  349 U.S. 133 (1955) ...................................................................................................... 6

*Powell v. Alabama*,
  287 U.S. 45 (1932) ........................................................................................................ 6

*In re Ronald M. Schiller & Eugene J. Chesrow, Jr.*,
  CFTC No. 96-4, 2002 WL 2007921 (Sept. 3, 2002) ..................................................... 6

*SEC v. Collector's Coffee, Inc.*,
  337 F.R.D. 70 (S.D.N.Y. 2020) .............................................................................. 14, 15

*SEC v. Genovese*,
  No. 17 Civ. 5821, 2022 WL 4115947 (S.D.N.Y. Sept. 9, 2022) ................................. 15

*SEC v. Jarkesy*,
  144 S. Ct. 2117 (2024) ........................................................................................... 11, 12

*SEC v. Pentagon Capital Management PLC*,
  No. 08 Civ. 3324, 2010 WL 4608681 (S.D.N.Y. Nov. 12, 2010) ............................... 10

*SEC v. Sason*,
  No. 19 Civ. 1459 (S.D.N.Y. May 27, 2020) .......................................................... 13, 15

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) .................................................................................................... 11

*Sperry & Hutchinson Co. v. FTC*,
  256 F. Supp. 136 (S.D.N.Y. 1966) .............................................................................. 12

*Spinelli v. City of New York*,
 No. 02 Civ. 8967, 2010 WL 4273285 (S.D.N.Y. Oct. 28, 2010) ........................................ 11

*Taylor v. Kentucky*,
 436 U.S. 478 (1978) ............................................................................................................. 6

*United States v. Avenatti,*
 19 Cr. 373, 2021 WL 2809919 (S.D.N.Y. July 6, 2021) ...................................................... 13

*United States v. Bagley*,
 473 U.S. 667 (1985) ............................................................................................ 6, 7, 11, 12

*United States v. Edwards*,
 777 F. Supp. 2d 985 (E.D.N.C. 2011) ............................................................................. 6, 12

*United States v. Gupta*,
 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ....................................................................... 7, 13, 15

*United States v. Maniktala*,
 934 F.2d 25 (2d Cir. 1991) ................................................................................................... 7

*United States v. Martoma*,
 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ................................................................................. 13

*United States v. Petit*,
 438 F. Supp. 3d 212 (S.D.N.Y. 2020) ................................................................................. 13

*United States v. Project on Gov't Oversight*,
 839 F. Supp. 2d 330 (D.D.C. 2012) .................................................................................... 12

## PRELIMINARY STATEMENT

The Commodity Futures Trading Commission ("CFTC") wields sweeping investigative and enforcement powers and can impose serious, life-altering consequences on the individuals and entities it targets. Here, the CFTC took full advantage of its powers, engaging in a years-long, industry-wide investigation, and ultimately using that investigation as a springboard for this enforcement action. The CFTC now seeks to impose substantial monetary penalties on defendant John Gorman and *permanently* enjoin him from ever being registered, *in any capacity*, with the CFTC, a sanction that would end his career in the industry. Indeed, the filing of this case in early 2021 has effectively stalled Mr. Gorman's career for almost four years. The CFTC at the same time refuses to share the exculpatory evidence it acquired during its years-long investigation in which it deployed government-bestowed subpoena power on industry participants.

The Fifth Amendment's Due Process Clause prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. Due process requires that the government provide those it seeks to punish with a fair trial. In *Brady v. Maryland*, the Supreme Court held that the government violates due process when it fails to disclose evidence favorable to the accused that is material to guilt or punishment. What is now known as the "*Brady* rule" protects a criminal defendant's right to a fair trial by leveling the playing field between the government and defense, promoting accurate results, and ensuring that the prosecution pursues the cause of justice. Each of these considerations applies with full force to civil enforcement actions like this one, where the government action threatens life-changing financial penalties and career-ending injunctive relief.

And because the CFTC worked hand in glove with the U.S. Attorney's Office for the Southern District of New York ("USAO") to conduct its industry-wide investigation, it must

provide Mr. Gorman with discoverable materials that are in the possession of the USAO, including *Brady* material. That is particularly true where, as here, the CFTC strategically chose not to take certain discoverable materials into its possession in the first instance.

## BACKGROUND

The CFTC is an independent federal regulatory agency responsible for investigating and prosecuting fraud, manipulation, and other deceptive practices in the nation's derivatives markets.[1] To carry out that mission, the CFTC's investigative arm gathers evidence and information by compelling entities and individuals to produce documents and provide testimony, to make available for inspection records and information, and to comply with litigation holds and preservation demands, all under threat of potential litigation.[2] Those wide-ranging investigative powers are paired with the ability to sign up cooperating witnesses, whom the CFTC can incentivize to provide evidence and testimony against others by declining to sue them for their own wrongdoing, or by providing credit for cooperation in civil enforcement actions brought against them.[3] The CFTC can also pay whistleblowers for information and assistance.[4] And on top of its own investigative powers, the CFTC frequently partners with criminal law enforcement authorities, sharing information and resources.[5] Ultimately, the CFTC can bring civil enforcement actions seeking a variety of financial sanctions, including penalties of up to triple the monetary gain to the individual defendant, and injunctive relief, including permanently barring individuals

---

[1] *See* Commodity Futures Trading Comm'n, *About the CFTC*, https://www.cftc.gov/About/AboutTheCommission; *see also* Commodity Futures Trading Comm'n, *Div. of Enforcement*, https://www.cftc.gov/About/CFTCOrganization/DOE.

[2] *See* Commodity Futures Trading Comm'n, *Div. of Enforcement*, https://www.cftc.gov/About/CFTCOrganization/DOE; *see also* Ex. 1 (Commodity Futures Trading Comm'n Enforcement Manual) at 3-4, 18.

[3] *See* Ex. 1 at 8, 34-36.

[4] *See id.* at 7-8.

[5] *See id.* at 37-38.

from trading in the derivatives markets.[6]

Almost a decade ago, in 2015, the CFTC launched the investigation known as *In re Swaps Trading Related to Bond Issuances* ("*STRBI*") that resulted in this case. The *STRBI* investigation examined potential fraud and other regulatory violations in connection with bond issuances and corresponding interest rate swaps. The CFTC interviewed witnesses employed by various financial institutions, conducted depositions, and gathered hundreds of thousands of documents and audio recordings. It also signed up a cooperating witness who has agreed to provide the CFTC with, among other things, testimony relevant to the investigation and any enforcement action.[7] From the start of the *STRBI* investigation, the CFTC partnered with the USAO. The CFTC granted the USAO access to the agency's investigative files,[8] and the CFTC and USAO jointly interviewed witnesses,[9] jointly held proffers,[10] shared documents,[11] and exchanged several hundred emails—

---

[6] *See id.* at 23, 29.

[7] *See* Ex. 2 (Cooperation Agreement). Out of an abundance of caution, and though not required by the Protective Order, *see* ECF 75 (Stipulated Protective Order) at 8-9, Mr. Gorman has not filed exhibits 2, 4-6, 8-11, 13, 49-50, 52, or 58-62, which may contain content about individuals or entities the CFTC or USAO interviewed. Mr. Gorman is prepared to provide those documents to the Court upon request.

[8] *See* Ex. 3 (Dec. 21, 2015 CFTC-USAO Access Grant).

[9] *See, e.g.*, Ex. 4 (Feb. 26, 2021 Calendar Invitation from A. Thomas); Ex. 5 (Mar. 16, 2021 Calendar Invitation from J. Wheaton); Ex. 6 (Nov. 19, 2020 Email from A. Thomas); Ex. 7 (Feb. 16, 2021 Calendar Invitation from D. Cain); Ex. 8 (Nov. 12, 2020 Email from G. Geanuleas); Ex. 9 (Dec. 2, 2020 Email from A. Thomas); Ex. 10 (Oct. 29, 2020 Email from J. Naftalis). Certain witnesses were interviewed multiple times. *See, e.g.*, Ex. 11 (Mar. 8, 2021 Calendar Invitation from D. Cain).

[10] *See, e.g.*, Ex. 12 (Dec. 16, 2019 Email from G. Geanuleas Scheduling Joint Proffer); Ex. 13 (June 10, 2019 Email from J. Estes Scheduling Joint Proffer).

[11] *See, e.g.*, Ex. 14 (May 24, 2016 Email Regarding Document Transfer); Ex. 15 (Dec. 6, 2018 Email Regarding Document Transfer); Ex. 16 (Feb. 26, 2019 Email Regarding Document Transfer); Ex. 17 (Mar. 12, 2019 Email Regarding Document Transfer); Ex. 18 (Apr. 8, 2019 Email Regarding Document Transfer); Ex. 19 (Apr. 18, 2019 Email Regarding Document Transfer); Ex. 20 (May 3, 2019 Email Regarding Document Transfer); Ex. 21 (May 21, 2019 Email Regarding Document Transfer); Ex. 22 (June 7, 2019 Email Regarding Document Transfer); Ex. 23 (June 27, 2019 Email Regarding Document Transfer); Ex. 24 (July 31, 2019 Email Regarding Document Transfer); Ex. 25 (Aug. 20, 2019 Email Regarding Document Transfer); Ex. 26 (Oct. 3, 2019 Email Regarding Document Transfer); Ex. 27 (Oct. 11, 2019 Email Regarding Document Transfer); Ex. 28 (Oct. 28, 2019 Email Regarding Document Transfer); Ex. 29 (Nov. 1, 2019 Email Regarding Document Transfer); Ex. 30 (Nov. 7, 2019 Email Regarding Document Transfer); Ex. 31 (Nov. 15, 2019 Email Regarding Document Transfer); Ex. 32 (Nov. 26, 2019 Email Regarding Document Transfer); Ex. 33 (Dec. 16, 2019 Email Regarding Document Transfer); Ex. 34 (Feb. 4, 2020 Email Regarding Document Transfer); Ex. 35 (Feb. 24, 2020 Email Regarding Document Transfer; Ex. 36 (July 21, 2020 Email Regarding Document Transfer); Ex. 37 (Sept. 17, 2020 Email Regarding Document Transfer; Ex. 38 (Oct.

not counting those the CFTC has withheld based on a claimed privilege.[12] Employees from the CFTC and USAO conferred about the investigation by phone and in person,[13] and the CFTC's employees visited the USAO's offices on different occasions to review notes taken during witness interviews—notes that have remained in the USAO's sole physical possession.[14]

In this case, the CFTC seeks to prove that Mr. Gorman violated the Commodity Exchange Act and the CFTC's regulations. *See* ECF 1 (Complaint), ¶¶ 80-95. The CFTC asks for financial sanctions, including civil monetary penalties, disgorgement, and restitution, and to bar Mr. Gorman *permanently* from ever trading on behalf of himself or others, or from otherwise being registered with the CFTC. *See id.* at 30-33.

After months of discovery, Mr. Gorman still lacks important information about the CFTC's investigation. He knows that the CFTC subpoenaed and interviewed employees of financial institutions who are very likely to have information relevant to his defense, including employees of Nomura and JBIC, the parties to the bond issuance and interest rate swap central to the CFTC's

---

5, 2020 Email Regarding Document Transfer); Ex. 39 (Nov. 16, 2020 Email Regarding Document Transfer); Ex. 40 (Nov. 20, 2020 Email Regarding Document Transfer); Ex. 41 (Mar. 15, 2021 Email Regarding Document Transfer).

[12] On November 21, 2024, the CFTC informed Mr. Gorman that it has "withheld for privilege certain communications between the CFTC and the USAO," and that the privileges "may include attorney-client privilege, attorney work product doctrine, government deliberative process privilege, government investigatory files privilege, informant's privilege, common interest doctrine, and/or other applicable privileges or doctrines." Ex. 42 (Nov. 21, 2024 Email from D. Cain). Because the CFTC has not yet provided a privilege log Mr. Gorman does not know the full extent of their communications and whether they are truly subject to that overlapping and extensive set of putative privileges.

[13] *See, e.g.*, Ex. 43 (Oct. 16, 2019 Email from G. Geanuleas (CFTC) asking A. Thomas, J. Estes and J. Naftalis (USAO) for time to discuss "Nomura"); Ex. 44 (Jan. 14, 2021 Email from A. Thomas (USAO) asking G. Geanuleas (CFTC) for time "to chat STRBI"); Ex. 45 (Mar. 27, 2020 Email from A. Thomas (USAO) asking G. Geanuleas (CFTC) for contact information for JBIC and another issuer); Ex. 46 (Feb. 3, 2021 Email from A. Thomas (USAO) asking G. Geanuleas (CFTC) question regarding third party's document production); Ex. 47 (June 27, 2019 Email from G. Geanuleas (CFTC) asking J. Estes (USAO) for a call); Ex. 48 (Dec. 4, 2020 Email from G. Geanuleas (CFTC) asking A. Thomas (USAO) for a call); Ex. 49 (Jan. 30, 2020 Email from G. Geanuleas (CFTC) providing A. Thomas (USAO) with list of Nomura employees represented by pool counsel); *see also, e.g.*, Ex. 50 (Dec. 30, 2020 Email from G. Geanuleas (CFTC) asking A. Thomas, J. Naftalis, and J. Estes (USAO) for call).

[14] Ex. 51 (Jan. 14, 2020 Email from A. Thomas (USAO) granting G. Geanuleas's request for J. Dubin (CFTC) to "come by tomorrow to look at the notes"); Ex. 52 (Nov. 16, 2020 Email from G. Geanuleas (CFTC) asking A. Thomas, J. Estes, and J. Naftalis (USAO) to examine notes from Jan. 29, 2020 joint proffer); Ex. 53 (June 23, 2021 Email from J. Estes (USAO) informing G. Geanuleas (CFTC) that "Notes are Ready").

4

complaint.[15] But a number of those entities and individuals are abroad, and Mr. Gorman has limited or no access to them. Mr. Gorman also does not know what each of those individuals said when they were interviewed, because the CFTC has refused his requests to produce the interview notes.[16] The CFTC has not responded to Mr. Gorman's repeated requests to identify other individuals the CFTC interviewed during the *STRBI* investigation.[17] To date, the CFTC has provided Mr. Gorman with notes from one interview, which it produced the *afternoon before* this brief was filed,[18] and only after the Court ordered their production. *See* ECF 89 (Order on Joint Letter Motion) at 1.

Mr. Gorman's Third Set of Requests for the Production of Documents asked for any documents that may contain information favorable or material to his defense under *Brady* and *Giglio*, including any such documents within the possession of entities with which the agency engaged in joint fact-gathering, such as the USAO.[19] The CFTC objected in full, and refused to produce any documents.[20] This brief followed.[21]

---

[15] *See, e.g.*, Ex. 13 (June 10, 2019 Email from J. Estes); Ex. 7 (Feb. 16, 2021 Calendar Invitation from D. Cain); *see also supra* n.9.

[16] *See* Ex. 54 (Oct. 18, 2024 Email from A. Cohen). The CFTC has told Mr. Gorman that he can request notes from interviews jointly conducted with the USAO from the USAO, a process that requires complying with the Department of Justice's *Touhy* regulations. *See id.* Mr. Gorman has submitted two such requests to the USAO. His first request was granted. His second request remains pending.

[17] *See, e.g.*, Ex. 55 (Nov. 12, 2024 Email from S. Kelly) at 2-3; *id.* (Nov. 19, 2024 Email from S. Painter) at 1-2; *id.* (Nov. 19, 2024 Email from H. Andrews) at 1.

[18] *See* Ex. 56 (Nov. 21, 2024 Letter from D. Cain).

[19] *See* Ex. 57 (Mr. Gorman's Third Set of Requests for the Production of Documents) at 8. "*Giglio* material" refers to impeachment evidence and falls within the scope of the government's disclosure obligations under *Brady*. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972). Mr. Gorman's motion seeks both *Brady* and *Giglio* material.

[20] *See* Ex. 54 (Oct. 18, 2024 Email from A. Cohen); *see also* Ex. 55 (Nov. 19, 2024 Email from S. Painter) at 1-2.

[21] Pursuant to the Court's order on the parties' joint letter motion, *see* ECF 89 (Order on Joint Letter Motion) at 4, the parties met and conferred regarding Mr. Gorman's request to produce *Brady* and *Giglio* material, and material within the possession of the USAO, on October 31, 2024. The CFTC refused to produce *Brady* and *Giglio* material and continues to refuse to answer Mr. Gorman's questions regarding what discoverable evidence remains in the possession of the USAO. *See* Ex. 55 (Nov. 19, 2024 Email from S. Painter). This motion addresses both issues.

# ARGUMENT

I.  **The Due Process Clause Demands That the CFTC Provide Mr. Gorman with Exculpatory Evidence in Its Possession**

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955); *see also, e.g.*, *Taylor v. Kentucky*, 436 U.S. 478, 490 (1978). Because the protections of due process apply where the government seeks to deprive individuals of life, liberty, or property, the government has affirmative obligations to protect and effectuate the right to a fair trial. *See, e.g.*, *Powell v. Alabama*, 287 U.S. 45, 68-71 (1932). Among other things, the due process guarantee of a fair trial animates what is called the *Brady* rule, under which the government must disclose favorable evidence that is material to guilt or punishment. *See Brady*, 373 U.S. 83, 87 (1963); *see also United States v. Bagley*, 473 U.S. 667, 675 (1985) ("The *Brady* rule is based on the requirement of due process."). The reasoning behind *Brady* is simple: If the government fails to disclose material, exculpatory evidence, the government deprives the defendant of a fair trial. *See Brady*, 373 U.S. at 87; *Bagley*, 473 U.S. at 675.

The *Brady* rule protects the right to a fair trial in three different ways: (1) It provides a defendant access to favorable evidence that might otherwise be unknown to the accused but for the government's affirmative obligation to disclose it; (2) it promotes accuracy and enhances the trial's truth-finding function; and (3) it ensures that the prosecution pursues the cause of justice. Historically, the *Brady* rule has applied largely in criminal cases, where the government seeks to take away an individual's liberty. But each rationale for *Brady* applies wholesale to the civil enforcement context.[22]

---

[22] For that reason, courts have applied *Brady* to various civil proceedings. *See, e.g.*, *United States v. Edwards*, 777 F. Supp. 2d 985, 996-98 (E.D.N.C. 2011) (applying *Brady* in an involuntary civil commitment proceeding); *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993) (applying *Brady* in a denaturalization and extradition proceeding); *see also EEOC v. Los Alamos Constructors, Inc.*, 382 F. Supp. 1373, 1383 n.5 (D.N.M. 1974) ("A defendant in a civil case brought by the government should be afforded no less due process of law [than a defendant in a criminal case]."). In the past, the CFTC itself has held that *Brady* applies in certain administrative enforcement proceedings. *See, e.g.*,

*First*, the *Brady* rule helps ensure a level playing field between the government and defendants. A fair trial requires that the government and defendants have access to similar evidence and information. But law enforcement authorities enjoy investigative powers and resources that far outmatch even the most well-equipped defendants. The government can search individuals and their property, it can seize evidence of wrongdoing, and it can obtain cooperation from witnesses by threatening them with criminal prosecution. Criminal defendants cannot do any of these things. Requiring the government to disclose evidence that tends to exculpate the accused helps to reduce the power imbalance inherent in criminal prosecutions and ensures that defendants have access to favorable evidence. *See Bagley*, 473 U.S. at 694 (Marshall, J., dissenting) (explaining that the *Brady* rule "stems in part from the frequently considerable imbalance in resources between most criminal defendants and most prosecutors' offices").

*Brady* is not a discovery device. It is "a rule of fairness and minimum prosecutorial obligation." *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (cleaned up). The *Brady* rule exists apart from the government's discovery obligations because defendants do not know what material, exculpatory evidence may be in the government's possession until the government affirmatively discloses it. *See United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012) ("[T]he purpose of *Brady* is to apprise the defendant of exculpatory evidence obtained during the fact-gathering that might not otherwise be available to the defendant.").

*Brady*'s protections are no less critical in civil enforcement actions, which implicate the

---

*In re First Guar. Metals, Co.*, CFTC No. 79-55, 1980 WL 15696, at *9 (July 2, 1980) ("Since *Brady* is premised upon due process grounds we hold that its principles are applicable to administrative enforcement actions such as this which, while strongly remedial in nature, may yield substantial sanctions."); *see also, e.g.*, *In re Ronald M. Schiller & Eugene J. Chesrow, Jr.*, CFTC No. 96-4, 2002 WL 2007921, at *1 n.7 (Sept. 3, 2002) ("*Brady*, in the context of Commission enforcement proceedings, requires that the Division use due diligence to provide respondents with all non-cumulative material, within the possession, custody or control of any office of the Commission, that contains any information that is arguably exculpatory.").

defendant's right to a fair trial in similar ways as criminal prosecutions. As in criminal prosecutions, the government in civil enforcement actions has advantages that heavily tilt the playing field in its favor. Federal agencies have sweeping investigative powers and resources that rival those enjoyed by traditional law enforcement authorities. Federal agencies, including the CFTC, can issue subpoenas, compel testimony, and take evidence; offer monetary incentives to individuals who blow the whistle on possible wrongdoing; and elicit cooperation from critical witnesses, whom they can threaten with costly investigations and lawsuits.[23] And those agencies can supplement their own resources with those of criminal law enforcement counterparts, with whom agencies routinely partner to conduct factfinding.[24]

That is exactly what happened here. The CFTC flexed its extensive investigative powers, undertaking a years-long investigation, including sharing documents, holding proffers, and interviewing well over a dozen witnesses, including at least 10 with the USAO, and many of whom signed tolling agreements.[25] But through delay, gamesmanship, and hyper-technical interpretations of Mr. Gorman's written discovery requests, the CFTC has consistently refused to provide Mr. Gorman with basic information about the investigation.[26] To this day, the agency continues to either stonewall or slow-play Mr. Gorman's reasonable requests, such as identifying how many individuals the agencies interviewed and who those individuals were.[27] In so doing, the CFTC has hampered Mr. Gorman's ability to mount a full and fair defense. Specifically, the

---

[23] *See, e.g.*, Ex. 1 (Commodity Futures Trading Comm'n Div. of Enforcement—Enforcement Manual) at 3-4, 7-8, 34-36.

[24] *See, e.g.*, *id.* at 37-38.

[25] *See, e.g.*, Ex. 58 (Tolling Agreement); *see also, e.g.*, Ex. 59 (Tolling Agreement); Ex. 60 (Tolling Agreement); Ex. 61 (Tolling Agreement); Ex. 62 (Tolling Agreement).

[26] Mr. Gorman asked for communications between the CFTC and USAO over a year ago in his First Set of Requests for Production. Ex. 63 (Mr. Gorman's First Set of Requests for the Production of Documents). The CFTC did not provide those communications until November 13, 2024. *See* Ex. 64 (Nov. 13, 2024 Letter from D. Cain).

[27] *See* Ex. 55 (Nov. 12, 2024 Email from S. Kelly) at 2-3; *id.* (Nov. 19, 2024 Email from H. Andrews) at 1.

CFTC has prevented him from knowing whether there are witnesses with relevant or exculpatory information or evidence. All of this is complicated by the fact that many witnesses (including the alleged "victim," JBIC) live outside the United States. The CFTC, as a government agency, was able to secure voluntary cooperation (including documents and testimony) from JBIC (which has certain U.S. operations), but JBIC has at the same time declined to cooperate at all with Mr. Gorman.[28] As another example, while the USAO maintains possession of notes taken during the interviews conducted with the CFTC, the CFTC can access those notes upon request.[29] But even though the CFTC participated in those interviews and has seemingly unfettered access to the notes, the CFTC claims that the information is not in its possession.[30] That approach perfectly exemplifies why the *Brady* rule is required in this context to ensure basic fairness; the CFTC is on fundamentally different footing than Mr. Gorman.

The CFTC's five-page production the afternoon before this brief was filed makes clear why the *Brady* rule is required to ensure basic fairness. For months, the CFTC fought tooth and nail to withhold notes from interviews with certain JBIC employees, repeatedly casting doubt on the notes' relevance and rebuffing Mr. Gorman's need for them.[31] But upon review, the notes, as

---

[28] As an example of the disparity of influence between Mr. Gorman and the CFTC in this case, the CFTC requested discovery from JBIC in 2016, and JBIC voluntarily agreed both to produce documents and allow the CFTC to interview two JBIC employees. But when Mr. Gorman made requests of JBIC in relation to this case, JBIC refused to provide any voluntary discovery. Further, the CFTC refused to share the documents it received from JBIC or the interview notes from the interviews of the two JBIC employees. In fact, it did not disclose the fact that it had *any* evidence at all from JBIC until *after* the parties spent months drafting, translating, and sending a letter rogatory to Japan. It was only after being ordered by the Court that the CFTC produced the documents it received from JBIC. *See* ECF 89 (Order on Joint Letter Motion) at 1. As another, the CFTC's primary cooperating witness, who committed to provide the CFTC with documents and testimony, refused service for weeks, and has yet to produce any documents to Mr. Gorman. *See* Ex. 2 (Cooperation Agreement).

[29] *See, e.g.*, Ex. 51 (Jan. 14, 2020 Email from A. Thomas (USAO) granting G. Geanuleas's request for J. Dubin (CFTC) to "come by tomorrow to look at the notes").

[30] *See* Ex. 55 (Nov. 19, 2024 Email from S. Painter) at 1-2; *see also* Ex. 54 (Oct. 18, 2024 Email from A. Cohen).

[31] *See, e.g.*, ECF 91 (Oct. 25, 2024 Conf. Tr.) at 20:10-20 ("[W]e don't make the argument that the Ishikawa interview notes are whole cloth not relevant. We, instead, make the argument that . . . these are subject to the work product privilege . . . and [Mr. Gorman] does not meet . . . the substantial need burden . . . . So it's not an argument just about – it's not an argument just about relevance."); *id.* at 21:13-14 ("These notes don't address the charge[d] transaction at

9

expected, cover topics at the heart of the CFTC's case, from JBIC's expectations about hedging an issuer swap, to trading before or during a pricing call.[32] When the CFTC opposed Mr. Gorman's request for an order compelling the CFTC to produce the notes, the CFTC argued that the interview had not addressed "[m]ost of the questions" that Mr. Gorman sought to ask the JBIC employee through the parties' letter rogatory. ECF 86 (Joint Letter Motion) at 5. But, again, the notes reveal that many of the CFTC's questions *directly track* those in the letter rogatory.[33] Basic fairness requires more.

The CFTC's conduct also distinguishes this case from others in which district courts have rejected *Brady*'s application to civil enforcement actions. In *SEC v. Pentagon Capital Management PLC*, No. 08 Civ. 3324, 2010 WL 4608681 (S.D.N.Y. Nov. 12, 2010), for example, the court denied defendants' *Brady* motion, reasoning that defendants had received access to the materials they had requested through pretrial discovery. *Id.* Not so in this case. Here, the CFTC has refused to provide Mr. Gorman with necessary evidence and information. More fundamentally, because *Brady* is not a discovery device but a rule of fairness, the CFTC cannot satisfy Mr. Gorman's demands for exculpatory material simply by complying with its general discovery obligations and providing him with documents that he already knows exists—*Brady* guarantees a defendant exculpatory material that he would not know about *until* the government

---

all.").

[32] *See* Ex. 65 at 5-6.

[33] *Compare* Ex. 65 at 3 (Q: "Why did JBIC select the 19901 and 19905 for pricing?", *with* ECF 80-1, Ex. D at 2 ("Why were the 19901 and 19905 screens selected as the reference screens for Project Ace?"); *compare* Ex. 65 at 3 (Q: "[D]id JBIC expect [the] 19901 and 19905 [screens] to reflect accurate prices at the time of call?"), *with* ECF 80-1, Ex. D at 3 ("[W]as it your expectation that the prices displayed on the 19901 screen during the pricing call would reflect market levels for 10-year swap spreads at the time of the pricing?"); *compare* Ex. 65 at 4 (Q: "[D]id you have conversations w[ith] dealers if screens would accurately reflect prices?"), *and id.* at 5 ("[D]id JBIC expect dealer to hedge issuer swap?"), *and id.* at 6 ("[D]id you have expectation the dealers would move prices w[ith] transactions?"), *and id.* at 6 ("[D]id you have conversations w[ith] dealer to find out if they moved prices?"), *with* ECF 80-1, Ex. D at 4 ("[D]id anyone at Nomura inform you or anyone else at JBIC that a trader at Nomura had sold 10-year swap spreads during the pricing call intentionally to move down the price level being displayed on the 19901 screen?").

discloses it.

*Second*, *Brady* promotes accurate results. A fair trial is one that pursues the truth, and in an adversarial system, the truth is determined by allowing opposing parties with a vested stake in the outcome to present all relevant information to the factfinder. Suppressing favorable evidence prevents the adversarial system from operating as intended. Requiring the government to disclose such evidence ensures that the accused can put critical information before the factfinder, "enhan[cing] the quest for the truth." *Bagley*, 473 U.S. at 693 (Marshall, J., dissenting).

Accuracy is no less important in civil enforcement actions when federal agencies can seek to strip individuals of professional licenses and ban them from pursuing their chosen livelihood.[34] Those are liberty interests that are entitled to due process protections. *See, e.g.*, *Spinelli v. City of New York*, No. 02 Civ. 8967, 2010 WL 4273285, at *1 (S.D.N.Y. Oct. 28, 2010). Civil enforcement actions can also impose severe financial sanctions, including punitive monetary penalties and asset forfeitures far beyond the amount of any ill-gotten gains. *See Sessions v. Dimaya*, 584 U.S. 148, 184 (2018) (Gorsuch, J., concurring) ("[T]oday's civil laws regularly impose penalties far more severe than those found in many criminal statutes."). In many cases, these sanctions can exceed those imposed in certain criminal proceedings. *See id.*

In *SEC v. Jarkesy*, the Supreme Court held that the right to trial by jury applies where agencies seek to impose civil monetary penalties "designed to punish and deter, not to compensate." *See* 144 S. Ct. 2117, 2130 (2024). As Chief Justice Roberts, writing for the majority, made clear, civil monetary penalties rank among the "most potent enforcement tools." *Id.* at 2130, 2126. Justice Gorsuch, concurring, explained that when the government seeks to take away an individual's property, due process requires nothing less than "the regular course of trial

---

[34] *See, e.g.*, Ex. 1 (Commodity Futures Trading Comm'n Div. of Enforcement—Enforcement Manual) at 23.

11

proceedings with their usual protections." *Id.* at 2154 (Gorsuch, J., concurring).

Some courts have rejected *Brady*'s application in civil proceedings on the ground that civil proceedings threaten "only" monetary penalties. *See, e.g.*, *United States v. Project on Gov't Oversight*, 839 F. Supp. 2d 330 (D.D.C. 2012) (explaining that "[w]hat is at stake in this case is money and reputation, not 'whether someone will be locked away'" (quoting *United States v. Edwards*, 777 F. Supp. 2d 985, 994 (E.D.N.C. 2011)). But that logic cannot be squared with *Jarkesy*, and it should not hold water here. A defendant cannot be denied what due process requires merely because the government seeks to take away the defendant's property and livelihood—the Constitution's guarantee of due process demands a fair trial all the same. *See Jarkesy*, 144 S. Ct. at 2145-46 (Gorsuch, J., concurring).

*Third*, *Brady* ensures that the prosecutorial function operates as intended. A fair trial demands that the prosecution ensure justice is done, rather than seek to win at any cost. But when the prosecution is permitted to withhold evidence that tends to exculpate the accused or reduce the accused's penalty, the prosecution frustrates the cause of justice. *See Bagley*, 473 U.S. at 675 (noting that the *Brady* rule is designed "not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur").

As in criminal cases, the government is no ordinary litigant in civil enforcement actions. Unlike private parties, federal agencies assume a prosecutorial function when they investigate and enforce the nation's civil laws and regulations.[35] When an agency assumes that role, its job is to ensure that justice is done, not merely win its case. *See Sperry & Hutchinson Co. v. FTC*, 256 F. Supp. 136, 142 (S.D.N.Y. 1966). An agency that withholds favorable evidence in a civil

---

[35] *See, e.g.*, Commodity Futures Trading Comm'n, *Div. of Enforcement*, https://www.cftc.gov/About/CFTCOrganization/DOE (describing the mission of the CFTC's Division of Enforcement as including "detecting, investigating and prosecuting violations of the Commodity Exchange Act (CEA) and CFTC regulations").

12

enforcement action frustrates the cause of justice no less than when a criminal prosecutor does so.

The CFTC's civil enforcement action here implicates the right to a fair trial in all these respects. The CFTC is a federal agency with sweeping investigative powers and resources, and it has brought those powers and resources to bear in this case against Mr. Gorman. The CFTC's end goal is banishing Mr. Gorman from his chosen profession—which could have disastrous effects on his ability to obtain gainful employment of any sort—and it seeks to punish him further by imposing civil monetary penalties, disgorgement, and restitution. *See* ECF 1 (Complaint) at 30-33. For Mr. Gorman, the professional, reputational, and financial stakes could not be higher. The CFTC is doing all this in its capacity as a "prosecut[or]," charged with rooting out fraud, manipulation, and deception.[36] To guarantee Mr. Gorman's due process right to a fair trial in these circumstances, *Brady*'s protections are necessary, and the CFTC should be compelled to produce any material, exculpatory evidence in its possession.[37]

## II. The CFTC Should Be Compelled to Produce Material Within the Possession of the USAO

The CFTC should also be compelled to produce discoverable information within the possession of the USAO, in addition to *Brady* and *Giglio* material, that arose out of the agencies' joint fact-gathering. *See United States v. Gupta*, 848 F. Supp. 2d at 494-95; *see also* Order at 1-2, *SEC v. Sason*, No. 19 Civ. 1459, ECF 86 (S.D.N.Y. May 27, 2020) (hereinafter "*Sason*"). Two government agencies engage in joint fact-gathering when they cooperate in "'investigating the facts of the case,'" such as by "'coordinati[ng] in conducting witness interviews'" together. *United States v. Avenatti*, 19 Cr. 373, 2021 WL 2809919, at *45 (S.D.N.Y. July 6, 2021) (quoting *United*

---

[36] Commodity Futures Trading Comm'n, *Div. of Enforcement*, https://www.cftc.gov/About/CFTCOrganization/DOE.

[37] To the extent any *Brady* material may be covered by the work-product privilege, the work-product privilege would be pierced by the *Brady* rule as an essential component of due process. *See, e.g.*, *United States v. Petit*, 438 F. Supp. 3d 212, 214-15 (S.D.N.Y. 2020); *Gupta*, 848 F. Supp. 2d at 493-97.

*States v. Martoma*, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014)). "[T]his is a fact-specific inquiry involving the 'consideration of the degree of cooperation between agencies.'" *SEC v. Collector's Coffee, Inc.*, 337 F.R.D. 70, 75 (S.D.N.Y. 2020) (quoting *Martoma*, 990 F. Supp. 2d at 461).

Here, there is no question the CFTC engaged in joint fact-gathering with the USAO. The CFTC first granted the USAO access to its *STRBI* investigative files in 2015.[38] Since then, and over at least a seven-year period, the CFTC and USAO worked closely together. The CFTC sent the USAO at least 28 batches of investigative materials.[39] By Mr. Gorman's count—because the CFTC has been unwilling to explicitly disclose such information—the CFTC and USAO conducted joint interviews with at least 10 witnesses,[40] coordinated efforts in conducting and planning those interviews,[41] and conferred with each other about the investigation over email, on the phone, and in person.[42] For example, the USAO asked to visit the CFTC to review its "Casemap."[43] And the CFTC—because it apparently does not keep notes from the joint interviews—sought to review notes from the joint interviews in the USAO's physical possession.[44] That degree of collaboration and coordination readily establishes joint fact-gathering, and distinguishes this case from those where the courts have declined to find sufficient coordination between the agencies. *See, e.g.*, *Collector's Coffee*, 337 F.R.D. at 75-76 (finding one joint interview and subsequent access to notes insufficient to establish joint fact-gathering).

---

[38] *See* Ex. 3 (Dec. 21, 2015 CFTC-USAO Access Grant).

[39] *See supra* n.11.

[40] *See supra* n.9.

[41] *See id.*; *see also supra* n.13.

[42] *See supra* n.13.

[43] *See* Ex. 66 (Mar. 28, 2019 Email from J. Estes (USAO) to G. Geanuleas (CFTC)).

[44] *See supra* n.14.

Because the CFTC and USAO engaged in joint fact-gathering, two disclosure obligations follow. *First*, the CFTC has an obligation to produce discoverable material in the possession of the USAO. When two agencies engage in joint fact-gathering, the enforcing agency is obligated to produce material from the joint fact-gathering that is within the possession of the non-enforcing agency. *See Sason* at 1-2 (finding of "joint fact-gathering" extended the "SEC's obligation to produce discoverable material . . . in the sole possession of [USAO]"); *see also SEC v. Genovese*, No. 17 Civ. 5821, 2022 WL 4115947, at *1 (S.D.N.Y. Sept. 9, 2022)[45]; *Collector's Coffee*, 337 F.R.D. at 75. Bafflingly, the CFTC is instead refusing to even answer basic questions about the joint investigation. *See* Ex. 55 (Nov. 19, 2024 Email from S. Painter) at 1-2.

*Second*, the CFTC must review material in possession of the USAO and disclose it to Mr. Gorman if exculpatory. Because due process requires the CFTC to disclose *Brady* material within its possession, and because joint-fact gathering establishes the CFTC's constructive possession over materials in the possession of the USAO, the CFTC's *Brady* obligations extend to the documents in the USAO's physical possession. *See Gupta*, 848 F. Supp. 2d at 494. If, for example, the CFTC conducted a joint interview with the USAO in which exculpatory information was revealed, the CFTC cannot sit idly by simply because it failed to take or retain its own notes.

## CONCLUSION

Mr. Gorman respectfully requests that the Court order the CFTC to produce any *Brady* or *Giglio* material in its possession or the possession of the USAO, and to produce discoverable material within the possession of the USAO.

---

[45] In *Genovese*, the court referred to the collaboration between the SEC and U.S. Attorney's Office for the District of New Jersey as a "joint investigation." *Genovese*, 2022 WL 4115947, at *1. Although courts have not always clearly distinguished between a "joint investigation" and "joint fact-gathering," *see Gupta*, 848 F. Supp. 2d at 494 (explaining that "joint fact-gathering is part of what is often referred to as 'joint investigation'"), joint fact-gathering is sufficient to trigger the enforcing agency's obligation to produce material within the possession of the non-enforcing agency, *see, e.g.*, *Sason* at 1-2; *see also, e.g.*, *Gupta*, 848 F. Supp. 2d at 494.

| | |
|---|---|
| Dated: November 22, 2024<br>New York, New York | By: *[signature]*<br>Sean Hecker<br>Michael Ferrara<br>Helen F. Andrews<br>Sean Kelly<br>HECKER FINK LLP<br>350 Fifth Avenue, 63rd Floor<br>New York, NY 10118<br>Tel: (212) 763-0883<br>Fax: (212) 564-0883<br>shecker@heckerfink.com<br>mferrara@heckerfink.com<br>handrews@heckerfink.com<br>skelly@heckerfink.com<br><br>Katherine Epstein<br>HECKER FINK LLP<br>1050 K Street NW, Suite 1040<br>Washington, DC 20001<br>Tel: (212) 763-0883<br>kepstein@heckerfink.com<br><br>*Counsel for Defendant*<br>*John Patrick Gorman III* |